UNITED STATES of America,
Plaintiff-Appellee,

v.

Joseph Daniel HAWKINS,
Defendant-Appellant.

No. 77–1047.

United States Court of Appeals,
Fifth Circuit.

Jan. 30, 1978.

Rehearing and Rehearing En Banc
Denied Feb. 27, 1978.

Robert E. Hauberg, U. S. Atty., E. Donald Strange, Asst. U. S. Atty., Jackson, Miss., for plaintiff-appellee.

Before COLEMAN,* SIMPSON and TJOFLAT, Circuit Judges.

SIMPSON, Circuit Judge:

In this difficult and most unusual case, appellant Joseph Daniel Hawkins alleges that his constitutional and statutory rights were violated when the Clerk of the United States District Court for the Southern District of Mississippi conspired with a federal criminal defendant, Curtis Leo Hall, to fix the selection of the jury venire *in Hall's case.* The separate and unrelated criminal trials of Hall and Hawkins were scheduled for June 16 and 30, respectively, 1975, in the Jackson Division of the Southern District of Mississippi.[1] Facts indicating a likelihood that tampering with the Hall jury venire had been attempted were discovered after the venires for each trial had been selected, but prior to the trials. To avoid the possibility of prejudice, Judge Nixon, who was to preside over Hall's trial, and Judge Cox, who was to preside over Hawkins' trial, exchanged venires. As a result, Hawkins was tried by a jury selected from the venire originally drawn for the Hall trial. Hawkins did not learn of the attempted jury tampering until 17 months after his conviction, which, in the interim, had been affirmed without opinion by a panel of this Court. 529 F.2d 521 (5th Cir. 1976), cert. denied, 429 U.S. 853, 97 S.Ct. 145, 50 L.Ed.2d 127. Upon learning of the attempt at jury tampering, Hawkins filed a motion for a new trial which Judge Cox denied after a hearing extending over several days in December 1976.

Joseph Daniel Hawkins, pro se.

Laughlin McDonald, ACLU Foundation, Neil Bradley, Atty., Atlanta, Ga., for defendant-appellant.

* Judge Coleman was present at oral argument of this appeal but immediately thereafter recused himself and did not participate further. The case is decided by a quorum. Title 28, USC, § 46(d).

1. Both Hall and Hawkins were tried for furnishing false identification in connection with the acquisition of a firearm, in violation of Title 18, U.S.C., §§ 922(a)(6) and 924(a). The charges arose out of separate transactions.

The problem in this case is not whether the clerk of the district court corruptly endeavored to fix a jury. He did. Rather, the specific and only issue before us is whether this corrupt endeavor in any way violated the constitutional and statutory rights of Joseph Daniel Hawkins. We hold that it did not, and affirm.

## I. THE FACTS

Our holding cannot be understood without a detailed explication of the jury selection process in the Southern District of Mississippi and of the conspiracy to interfere with that process in the Hall case.

### A. The Jury Selection Process

■ Pursuant to the Jury Selection and Service Act of 1968, 28 U.S.C., §§ 1861 et seq. (1968), the Southern District of Mississippi adopted a plan for the random selection of grand and petit jurors.[2] The selection procedure outlined in the plan as of the time of the venire selection involved in this case included three steps:

1. *Master Jury Wheel: Random Selection from Poll Books.* All qualified grand and petit jurors in the Southern District of Mississippi were selected from the official records of voter registration maintained in the 45 counties within the district. Each division within the district was required to make a random selection of names from the poll books of each county within that division. In the Jackson Division, the only division relevant to this case, the process began with the second name on each county's list, with every fifteenth name thereafter selected. The names chosen were directed to be placed in a master jury wheel. This was

done by assigning each name to a numbered card. The cards were separately filed and the numbers transferred to disks. Only the disks were placed in a wheel. The master jury wheel for the Jackson Division, containing a minimum of 15,000 names, was emptied and refilled between November 7, 1972, and May 31, 1973, to be refilled at four year intervals.

2. *Qualified Jury Wheel.* After filling the master jury wheel, the Jury Commission sent each prospective juror a qualification form to fill out and return so that it could determine which among those selected was not qualified for or was exempt from jury service. This determination was made by August 30, 1973, and the names of all persons drawn from the master jury wheel and not disqualified, exempt, or excused were placed in a qualified jury wheel for the division, to be emptied and refilled every four years thereafter. The qualified jury wheel itself, like the master wheel, contained only numbered disks corresponding to numbered name cards.

3. *Petit Jury Venires.* Upon the order of a district judge in the Southern District, a specified number of disks would be drawn from the qualified jury wheel for the division and the persons thus selected would be summoned to appear for service as petit jurors. This drawing was required to be conducted in a district courtroom, in public, and in the presence of a district judge and the United States Marshal.

### B. Selection of the Hall Jury Venire[3]

After Leo Hall was indicted on federal firearms charges in January 1975, he sought

---

**2.** This plan was adopted by the Southern District of Mississippi on November 16, 1972, and approved by the Judicial Council for the Fifth Circuit Court of Appeals on December 20, 1972, as required by 28 U.S.C., § 1863(a). Although it is not a part of the record in this case, it is an official, public record on file with this Court and a proper subject for judicial notice on appeal. Fed.R.Evid. 201(b) and (f); *Massachusetts v. Westcott*, 431 U.S. 322, 323 n.2, 97 S.Ct. 1755, 1756 n.2, 52 L.Ed.2d 349 (1977).

**3.** The facts set out in this section are drawn from several sources included in the record

before us. Throughout the text we will indicate the source of specific facts by using an abbreviated citation form. References to the record on appeal as originally certified to this Court are indicated by "R", followed by the appropriate page number. Most "R" references will be to the transcript of testimony taken at the hearing before Judge Cox on Hawkins' motion for a new trial. During that hearing, Judge Cox asked the United States Attorney to furnish him with a copy of the grand jury proceedings in the jury tampering case

assistance from Robert Thomas, the Clerk of the District Court for the Southern District of Mississippi. Thomas, who had been acquainted with Hall for over 20 years, indicated at that time that he would try to help Hall. *Hall.* 19; *Thomas.* 17–18; *G.J.* 126 (testimony of Curtis Leo Hall).

On May 12, 1975, District Judge Walter Nixon ordered the Jury Commission for the Southern District of Mississippi, headed by Thomas, to draw from the qualified jury wheel for the Jackson Division 75 petit jurors to appear on June 16, 1975. R., Ex. P-1. These 75 persons were to comprise the venire for the trial of Leo Hall. The drawing took place before Judge Cox on May 16, 1974.[4] Fourteen days later, on May 30, summonses were sent by certified mail to the 75 persons selected. R. Ex. P-1.

On May 21, 1975, Thomas called Willie Darrell Kendall, one of Hall's attorneys, and asked him to come to Thomas' office in the United States Courthouse. There Thomas handed Kendall a package which contained a 50 to 60 page list of all qualified prospective jurors for the Jackson Division.[5] Thomas asked Kendall to deliver the master list to Hall. At no point, so far as the evidence reveals, did Thomas divulge the actual venire that had been drawn for Hall's trial.[6]

After returning to his law office, Kendall tried unsuccessfully to contact an Assistant United States Attorney.[7] He then called Hall and arranged for Hall to pick up the list. Two days later, on May 23, Kendall was summoned to Hall's office where Hall gave him material to deliver to Tom Royals, another of Hall's attorneys. This material

involving Thomas and Hall for *in camera* inspection. R. 521. Judge Cox reviewed the transcript of the grand jury proceedings and commented briefly on it in his opinion denying Hawkins' motion. R. 283. That transcript was certified to this Court *in camera* by Judge Cox's direction on October 19, 1977. References to testimony given before the grand jury on May 12, 1976, are indicated by "G.J." followed by the appropriate page or exhibit number. On November 11, 1977, we granted Hawkins' motion to correct or modify the record pursuant to Rule 10 F.R.A.P. by adding as exhibits the transcripts of plea and sentence in *United States v. Curtis Leo Hall,* Crim. No. J76-29(C), S.D.Miss., September 26, 1976, and *United States v. Robert Carl Thomas,* Crim. No. J76-29(C), S.D. Miss., October 5, 1976. References to the transcripts in the *Hall* and *Thomas* cases are indicated by *"Hall."* and *"Thomas.",* respectively, followed by the appropriate page number.

4. Deputy Clerk Rita Carver transcribed the numbers on the disks drawn before Judge Cox. Her list of numbers drawn, which she prepared in the courtroom, indicates that the drawing took place on "5–16–75." G.J. Ex. 2. To verify the date of the drawing, we directed that a supplemental record be certified and transmitted pursuant to Rule 10(e) F.R.A.P. At our direction, the Clerk of the District Court for the Southern District of Mississippi has examined the records of pay vouchers for the Jury Commissioner for that district for the month of May, 1975, and has certified that the only voucher issued after May 12, 1975, was to Paul Bellinger, Jury Commissioner, for two hours of services rendered on May 16, 1975. Mr. Bellinger took part in the drawing before Judge Cox. R. 475.

5. We cannot determine the origin of this list and can only infer that it was prepared unofficially by someone with access to the Clerk's files. The list, which included names, addresses, and corresponding disk numbers, was arranged in numerical order and its existence was unknown to at least two persons intimately associated with the jury selection process, Judge Cox and Deputy Clerk Rita Carver. G.J. 62–65, 76–81 (testimony of Rita Carver). When the list was described to Judge Cox at the hearing on Hawkins' motion for a new trial, he expressed doubt that it actually existed: "I can't conceive to save my life of what kind of list it would be that would be approximately 50 pages long". R. 354. The list does exist, however, and was preserved as an exhibit before the grand jury in the Thomas-Hall case. G.J. Ex. 1.

6. During the hearing on Hawkins' motion for a new trial, his attorney tried to establish that Thomas had distributed the typewritten venire list, Ex. Court-2, to Hall's attorneys, Kendall and Royals. Both denied that this was the list that had been circulated. R. 328–29 (Kendall); 346, 356 (Royals).

7. Kendall did not actually describe the incident to the Assistant United States Attorney until May 26, 1975. G.J. 16, 22 (testimony of W. D. Kendall). The sequence of events after that point is unclear. It is clear, however, that at some point between May 30 and June 16, Judge Nixon informed Judge Cox that "some irregularity" had occurred and suggested switching venires.

consisted of a photocopy of the master list furnished by Thomas and a photocopy of a list in Hall's handwriting containing the names of approximately 13 prospective jurors who might be favorable to Hall. Hall wanted Royals to review the list to see if he knew any of the prospective jurors. Kendall delivered this material to Royals at his home that evening. Realizing that a criminal act was being committed, Royals called Hall, had him bring over his copy of the master list, burned both copies in his fireplace, and resigned as Hall's attorney. Unknown to Royals, however, Hall had made two copies of the master list. Although these two copies were burned on May 24, the original furnished by Thomas remained intact. G.J. 17–18 (testimony of W. D. Kendall); 98–103, 132–33, Ex. 5 (testimony of Leo Hall); 144–50 (testimony of Tom Royals).

On May 28, 1975, Hall and Thomas arranged to meet on a roadside in Jackson, Mississippi. At that meeting, Hall returned the original master list to Thomas along with the handwritten list of potential jurors that he hoped would be placed on the venire. *Hall.* 20; *Thomas.* 19; G.J. 103–7 (testimony of Leo Hall). According to Kendall, on May 29 Thomas called Kendall to his office and told him that he was attempting to put the names selected by Hall on the venire for the firearms case scheduled for trial on June 16, 1975. G.J. 19 (testimony of W. D. Kendall). Thomas denied that he made such a statement to Kendall. *Thomas.* 20.

As a result of this conduct, Thomas and Hall were indicted by a federal grand jury on charges of conspiring to obstruct justice in violation of Title 18, U.S.C., § 371, corruptly endeavoring to obstruct justice in violation of Title 18, U.S.C. § 1503, and, as to Thomas only, contempt of court and unauthorized disclosure of jury selection records, in violation of Title 18, U.S.C. § 401(2) and Title 28 U.S.C. § 1867(f), respectively. The indictment was filed on July 23, 1976. R. Ex. D–2. Several months later, both Thomas and Hall pleaded guilty to the conspiracy count; the other charges were dismissed.

Testimony and documentary evidence before the grand jury, which this Court has reviewed, establish that Thomas and Hall *attempted* to stack the venire for Hall's trial in the period between the drawing on May 16 and the mailing of summonses on May 30. In his motion for a new trial, Hawkins makes a further allegation:

> Defendant alleges on information and belief . . . that Robert Carl Thomas did place on the venire certain names furnished by Curtis Leo Hall . . .[8]

Contrary to this allegation, we have been able to determine conclusively that the venire used in Hawkins' trial was identical with the one selected for Hall's trial; it contained no names other than those selected at the May 16 drawing, *before* Hall received the master jury list and furnished a list of names to Thomas. The evidence upon which we base this conclusion follows.[9]

---

8. R. 238. We note that the conspiracy to place and the actual placing of names selected by Hall on the venire are the only allegations of impropriety made by Hawkins. Significantly, Hawkins does not allege that any prospective juror knew of the attempted tampering or was contacted by anyone in an effort to assist Hall. Although many of Hawkins' points on appeal allege that Judge Cox's rulings improperly limited Hawkins' ability to unearth facts relevant to his motion, these rulings did not extend to information regarding impermissible influence of jurors because that allegation was never made. Cf. *United States v. Riley*, 544 F.2d 237, 242 (5th Cir. 1976). In this appeal, Hawkins has modified his original allegation of impropriety: "The record does not reveal precisely what the 'irregularity' was that 'had occurred'

in the selection of the Hall-Hawkins jury for the reason that appellant was not permitted to make a complete evidentiary showing". Brief for Appellant at 6. See also note 11, *infra*. Nevertheless, in his initial interview with the F.B.I. on August 12, 1975, Hall stated: "I did not contact any of the jurors contained on the list, nor did I have anyone intercede for me to contact the jurors on the list". G.J. Ex. 5. In his testimony before the grand jury, Hall confirmed the accuracy of this statement. G.J. 107–8 (testimony of Leo Hall).

9. We assume that the validity of Hawkins' allegation might be tested by comparing the list of "favorable" jurors prepared by Hall against the venire actually drawn for Hall's trial (and later used at Hawkins' trial). Unfortunately, how-

Present at the drawing before Judge Cox on May 16 were Thomas, Jury Commissioner Paul Bellinger, Deputy Clerk Rita Carver, and a United States Marshal. Thomas and Bellinger thrice drew 25 numbered disks from the qualified jury wheel for the Jackson Division on an alternating basis, rotating the wheel after each draw of 25, until 75 disks had been drawn. As the disks were drawn, the numbers were read to Mrs. Carver, who recorded them on a yellow legal pad in the order drawn. The disks were then placed in an envelope, not to be used again. After the drawing, Mrs. Carver matched the recorded numbers with the corresponding name cards and questionnaires in the Clerk's files, and typed a list of the 75 names drawn. R. 475–81 (testimony of Rita Carver).

During her testimony before the grand jury, Mrs. Carver examined Grand Jury Exhibit 2, the file relating to the jury venire drawn on May 16, 1975. She stated that one item in the file, a sheet of lined, yellow legal sized paper on which was written

"Petit Jurors Summoned for Service June 16, 1975, At Jackson, Miss. Judge Walter L. Nixon, Jr., Presiding

5–16–75",

followed by a list of 75 numbers, was the list prepared by her at the drawing before Judge Cox. She also unsealed the envelope containing the disks drawn and compared them with the numbers on her handwritten list. The number on each disk corresponded to a number on the list. G.J. 70 (testimony of Rita Carver).

Although Mrs. Carver's testimony before the grand jury does not clearly reflect whether she compared the numbers on the handwritten list with those on the juror questionnaires and the names on those questionnaires with the names on the typewritten venire list, we have made such a comparison and have found an exact correlation. The names on the typewritten ve-

nire list correspond to the numbers drawn before Judge Cox. Furthermore, records in the file establish that the summonses mailed on May 30 were addressed to each of the 75 persons drawn on May 16. G.J. Ex. 2.

As the summonses were returned, names were stricken from the original list of 75 in each instance where the person summoned either had presented a legitimate reason to be excused from jury service or could not be located. After 28 of the original 75 names were eliminated, a new list containing the remaining 47 names was typed. From this list eight additional names were excised as excused. R. 483 (testimony of Rita Carver); Ex. Court–2.

After the Hall venire was chosen, Judge Nixon, who was to preside over Hall's trial, learned of the jury tampering conspiracy between Thomas and Hall. Judge Cox explained what happened after Judge Nixon learned about the conspiracy:

Judge Nixon called me and said that he had heard—I hadn't even heard that there was any kind of irregularity about a jury—that he had heard that and he thought that the best thing for us to do would be to swap juries, and I readily agreed with him on the telephone, and that's how it was. (R. 394).

[W]hen it became rather public knowledge that some irregularity had occurred, this Court and Judge Nixon swapped juries, voluntarily, because we just didn't want anything to be irregular or improper, so Judge Nixon took the jury that I was supposed to use on Monday morning and I took the jury that he was supposed to have had. So he tried Mr. Hall before the jury that was summoned for my court, for my use, and I tried Mr. Hawkins here before a jury which Judge Nixon had summoned to try Mr. Hall.[10] (R. 347).

ever, that list is not a part of the record before us; we do not know whether it is extant. We are confident nonetheless that the available evidence adequately supports our conclusion, as explained in the text.

10. This statement may be misleading. Judge Nixon ordered the original Hall venire summoned, but Judge Cox presided over the drawing of that venire, as indicated in the text.

Thus, the venire used for Hawkins' trial was the one drawn before Judge Cox on May 16, 1975. The only change that had been made in that venire was that certain names were eliminated as excused from service or not found; no new names had been added. The twelve jurors who ultimately convicted Hawkins were all part of the original, randomly selected venire.

Although we are convinced that Hawkins was tried by a jury randomly selected from the qualified jury wheel, in compliance with the statute, 28 U.S.C. §§ 1861 et seq., and with the Southern District plan, we have no basis for concluding that the record in this case fully exposes the activities of Thomas, Hall, or others with regard to the conspiracy to "stack" the Hall jury venire. Facts relevant to the conspiracy still may have not been brought to light. While it is doubtless desirable to have those facts fully aired in some forum, this appeal is not the vehicle to achieve that end. Here our concern with the Hall-Thomas conspiracy is limited to whether it infringed the constitutional and statutory rights of Joseph Daniel Hawkins. In this context, the facts of record suffice for us to resolve the issues raised by Hawkins.

In this appeal, Hawkins contends that he is entitled to a new trial on both constitutional and statutory grounds involving the selection of the jury venire used for his trial. He alleges a violation of his Fifth Amendment due process right and his Sixth Amendment right to trial by jury for the reason that, if the jury that tried him was "stacked", it did not fairly represent a cross

section of the community. Similarly, he alleges that a "stacked" jury venire violates the command of the Jury Selection and Service Act that such venires be randomly selected. 28 U.S.C. § 1866(a). Hawkins concedes that the evidence he produced at the hearing on his motion for a new trial failed to demonstrate that the jury venire was actually "stacked" in Hall's favor, i. e., that the Thomas-Hall conspiracy achieved its aim.[11] In fact, most of Hawkins' points on appeal challenge rulings at the hearing which, Hawkins alleges, prevented him from proving actual interference.[12] We need not reach these issues because we hold that, regardless of what additional information might be developed at a new hearing, the substantive grounds underlying the motion for a new trial are without merit.

## II. *THE STATUTORY CLAIM*

 The Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861 et seq., establishes a detailed procedure to assure that grand and petit juries are randomly selected from a fair cross section of the community. Although the statute attempts to implement constitutional requirements, the right to a jury "selected *at random* " is a statutory creation, 28 U.S.C. § 1866(f) (emphasis added), not a constitutional command. *United States v. Kennedy*, 548 F.2d 608, 614 (5th Cir. 1977). And while a venire on which pre-selected names have been placed is not one "selected at random", this statutory right is not self-enforcing. Rather, Congress provided that defendants chal-

11. "It cannot be determined on the basis of the present record whether as part of the conspiracy or endeavor to 'fix' Hall's venire the composition of names in the jury wheel was altered, or whether some irregularity (unknown to other selection officials) was perpetuated [sic] by Thomas during or after the selection process." Brief for Appellant at 15–16.

12. Hawkins contends that his attempt to develop the facts was improperly inhibited in three respects: (1) Hawkins, through a subpoena duces tecum served on an F.B.I. Agent, sought to compel production of "the complete file concerning the investigation and prosecution" of Thomas and Hall for jury tampering. R. 257. Judge Cox quashed the subpoena. (2) During

the hearing, Hawkins requested permission to question the United States Attorney and his assistant. This request was denied. R. 443, 446–47. (3) Hawkins had initially subpoenaed Thomas, the former clerk. The subpoena could not be served because Thomas was out of town. Finally, Hawkins' attorney after interviewing Thomas told the Court he had decided that Thomas' testimony was not needed by Hawkins. At the hearing, Hawkins emphatically objected to his attorney's decision and stated that he wished to question Thomas. Judge Cox refused to issue a new subpoena for Thomas. At oral argument before us we were informed of the death of Thomas soon after the hearing on motion for new trial.

lenging jury selection under the Act must adhere to specific procedural requirements:

> The procedures prescribed by this section shall be the *exclusive* means by which a person accused of a Federal crime . . may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title. 28 U.S.C. § 1867(e) (emphasis added).

■ The first time that the Jury Selection and Service Act was mentioned in this case was in this appeal. The statutory claim was never squarely raised before Judge Cox. We hold that this amounts to such a pervasive failure to comply with the Act's procedural requirements that any statutory objection is now barred. Although this holding prevents us from ruling on the merits of the statutory claim, we reiterate that our examination of the record discloses that the venire used at Hawkins' trial was in fact randomly drawn.

### A. *Timeliness:*

Hawkins' trial began on June 30, 1975 and he was convicted the following day. His motion for a new trial based on newly discovered evidence was filed on November 12, 1976. Under the statute, Hawkins' motion was made too late to include a statutory objection:

> In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the ground therefore, *whichever is earlier*, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury. 28 U.S.C. § 1867(a) (emphasis added).

■ Because Hawkins did not move for a new trial until 17 months after his conviction, he cannot claim the protection of a statute designed to flesh out objections to jury selection in the pretrial stages. "One who fails to assert challenges before or during voir dire is foreclosed from later tardy actions which attack the validity of the jury plan". *United States v. De Alba-Conrado*, 481 F.2d 1266, 1269 (5th Cir. 1973). Accord: *United States v. Noah*, 475 F.2d 688, 695 (9th Cir. 1973), cert. denied, 414 U.S. 821, 94 S.Ct. 119, 38 L.Ed.2d 54; *United States v. Silverman*, 449 F.2d 1341, 1344 (2d Cir. 1971), cert. denied, 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788; *United States v. Rickus*, 351 F.Supp. 1386, 1388 (E.D.Pa. 1972), aff'd without opinion, 480 F.2d 919 (3d Cir.), cert. denied, 414 U.S. 1006, 94 S.Ct. 365, 38 L.Ed.2d 243.

Hawkins asserts that he could not have complied with the statute's timeliness requirement because he did not know about the Thomas-Hall conspiracy at the time of his trial in June 1975. The two attorneys who represented him at that trial swore that had they known about the alleged jury tampering they "would have filed a motion to quash the venire". R. 253.

■ In *United States v. Kennedy, supra,* we noted that "[a]bsent some indication from particular circumstances that counsel could not reasonably have been expected to comply with the procedural prerequisites to a statutory challenge to the jury, the claim under the Act will be forfeited by noncompliance". 548 F.2d at 613. At the same time, we concluded, based on the express language of the statute, "that Congress left no room for ad hoc review of the usefulness of compliance" with the procedural requirements. Id. Arguably, the statute can be interpreted as impliedly excusing compliance with the timeliness requirement where, as here, a potential irregularity in the jury selection process is known to the trial judge and the prosecutor but is unknown to the defendant.[13] Even if we were

---

13. Such an interpretation is fraught with problems. It contravenes the express language of the statute, 28 U.S.C. §§ 1867(a) and (e), and the apparent intent of Congress, H.R.Rep. No. 1076, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.Code Cong. & Admin.News 1792,

1805. Furthermore, the Act provides that "[i]f the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the petit jury, the court shall stay the proceedings pending the selection of a petit jury in conformity with this

to so hold, however, Hawkins' claim must fail because he did not properly raise the statutory objection in his motion for a new trial based on newly discovered evidence, as is explained below.

### B. *Pleading:*

Hawkins' motion for a new trial never mentioned the Jury Selection and Service Act. Instead, the motion specifically alleged only that "[t]he actions hereinafter complained off [sic] are in direct contravention of the rights guaranteed Defendant by the Fifth and Sixth Amendments to the Constitution of the United States". Furthermore, it requested a new trial "upon a finding that there has been a denial or infringement of the Constitutional rights of Defendant". The statute was not raised during the hearing on Hawkins' motion and is not mentioned in Judge Cox's unpublished opinion denying the motion. In short, Hawkins never raised a statutory objection before Judge Cox. His first reference to the statute was on appeal to this Court.

If we assume, for argument's sake only, that the statute impliedly excuses Hawkins' tardiness and that a motion for a new trial under these circumstances is appropriate as a vehicle for airing a statutory objection, we are still faced with the fact that Hawkins' motion for a new trial was not based on noncompliance with the statute. We cannot transform this motion—made, tried, and decided on constitutional grounds—into a statutory objection on appeal.

### III. *THE CONSTITUTIONAL CLAIM*

In prescribing strict procedural rules for raising statutory objections, Congress did not "preclude any person . . . from asserting rights created under other statutes or for enforcing constitutional rights".

title". 28 U.S.C. § 1867(d). Thus, the relief authorized for the type of violation alleged by Hawkins is inappropriate for posttrial motions. The statute does not provide that "substantial failure to comply" may be a basis for a motion for a new trial.

14. We recognize, of course, that this right is guaranteed not only by the general dictates of

H.R.Rep. No. 1076, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.Code Cong. & Admin.News at 1806; 28 U.S.C. § 1867(e). As we explained in *United States v. Kennedy, supra,* "forfeiture of the statutory claim in no way affects the sanctity of a defendant's due process right to be tried by a jury drawn from a fair cross section of the community". 548 F.2d at 613.

 Hawkins claims that, were he to prove actual interference with the jury selection in this case, he would establish a violation of his Fifth and Sixth Amendment rights. He further alleges that, absent actual interference, he was denied due process because "[i]llegal and unconstitutional jury selection procedures cast doubt on the integrity of the whole judicial process" and "create the likelihood or the appearance of bias", quoting the plurality opinion in *Peters v. Kiff,* 407 U.S. 493, 502, 92 S.Ct. 2163, 2168, 33 L.Ed.2d 83 (1972). Under the facts now established—and under any conceivable new facts that might later come to light—we hold that Hawkins has suffered no violation of his constitutional rights.

In *United States v. Kennedy, supra,* we outlined the showing required to sustain a claim such as that made by Hawkins:

> The due process clause does not itself guarantee a defendant a randomly selected jury, but simply a jury drawn from a fair cross section of the community. A claim of denial of this due process right requires a showing that the jury selection process tended to exclude or underrepresent some discernable class of persons and consequently to defeat a fair possibility for obtaining a truly representative cross section. 548 F.2d at 614.[14]

Hawkins has failed to make such a showing. He has not alleged that the pool from which his venire was selected was not fairly representative. Rather, his argument boils

the due process clause of the Fifth and Fourteenth Amendments, but also specifically by the Sixth Amendment. "[T]he selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial". *Taylor v. Louisiana,* 419 U.S. 522, 528, 95 S.Ct. 692, 697, 42 L.Ed.2d 690 (1975).

down to an assertion that the venire could not be fairly representative if it was stacked with the names of people believed by Curtis Leo Hall to be favorable to him. The underrepresented class, according to this rationale, presumably would be those people prejudiced against or indifferent to Curtis Leo Hall. Surely, this is not a "discernable class" such as women or blacks.[15] As the Supreme Court explained in *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690 (1975):

> Defendants are not entitled to a jury of any particular composition [citations omitted]; but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude *distinctive groups* in the community and thereby fail to be reasonably representative thereof. (Emphasis added).

Thus, if we assume the utmost that might be proven upon full and unfettered discovery—that the Thomas-Hall conspiracy in some way resulted in the selection of a tainted jury venire—we still could not find that Hawkins' constitutional right to a fairly representative jury has been abridged in this case.

Hawkins also argues that under the facts now known—an admitted *attempt* to stack the jury venire—his rights were violated because "due process is denied by circumstances that create the likelihood or the appearance of bias". *Peters v. Kiff, supra,* 407 U.S. at 502, 92 S.Ct. at 2168. Hawkins construes the plurality opinion in *Peters* too broadly. That opinion did not suggest that *any* appearance of bias in the selection of petit jurors violated due process. Rather, the plurality's observations were made in the context of "the exclusion from jury service of a substantial and identifiable class of citizens", specifically, blacks. Id. at 503, 92 S.Ct. at 2169. Attempts to corrupt the jury selection process undeniably tar-

nish the integrity of the judicial process and are to be uncompromisingly condemned. But the attempt involved in this case—which focused on the attitudes of a diverse group toward a single defendant and did not have as its aim the exclusion of a "discernable class"—did not rise to the level of a violation of Joseph Hawkins' constitutional rights.

## IV. *CONCLUSION*

We do not intend to minimize or obscure the fact that Hawkins has come before this Court claiming not only that he was denied his right to trial by a representative jury, but also that he was not afforded a fair hearing on his claim. We intimate no view on the issues raised by Hawkins with respect to the nature of the hearing on his motion for a new trial because we are satisfied that the underlying grounds for the motion are without merit. A reversal and remand for a new hearing on the basis of errors committed at the first hearing would be a futile gesture because Hawkins could never prevail on the merits of his claim.

In holding as we do today, we express no view as to the adequacy of the investigation conducted into the Hall-Thomas jury tampering conspiracy by either the United States Attorney or the District Court for the Southern District of Mississippi. In this case we are not called upon to approve or disapprove the measures taken to expose, punish, and prevent recurrence of this serious abuse of the judicial process. The sole issue before us is whether, under the facts now known or which might later be developed, Joseph Daniel Hawkins was deprived of his statutory and constitutional rights. We hold that he was not.

Accordingly, the district court's denial of the motion for a new trial based on newly discovered evidence is

AFFIRMED.

15. In *United States v. De Alba-Conrado,* 481 F.2d 1266, 1270 (5th Cir. 1973), we noted, "[o]n remand, the burden will be on appellant to prove that the jury selection process utilized in his case systematically and arbitrarily excluded a cognizable class or ethnic group from jury service to his prejudice". In a footnote, we explained that since the appellant in that case alleged the exclusion of Latin Americans, he would have to "establish by appropriate proof that Latin Americans are clearly a cognizable group in the Miami Division if such is the fact". Id., n.7.