**Lew S. McGINNIS and Highland Village, Ltd.**

v.

**M. I. HARRIS, INC., George T. Connell, M. David Hendrix, and Ralph D. Hammonds.**

CA–3–78–0439–G.

United States District Court, N. D. Texas, Dallas Division.

March 20, 1980.

Robert L. Blumenthal, Carrington, Coleman, Sloman & Blumenthal, Fletcher L. Yarbrough, William B. Dawson, Dallas, Tex., Schorr, Leonard & Felker, P. C., Tuscon, Ariz., for plaintiffs.

Walter M. Spradley, John R. Guittard, Payne & Spradley, Dallas, Tex., for both defendants Harris and Connell.

John H. McElhaney, Geo. E. Bowles, Charles R. Snakard, Locke, Purnell, Boren, Laney & Neely, Dallas, Tex., for Hendrix and Hammonds.

## MEMORANDUM ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

Defendants M. I. Harris, Jr. and George T. Connell have moved this court to declare a mistrial and declare void the verdict of the jury returned in this cause on February 4, 1980. They allege that the petit jury panel of 32 persons called by the court for selection of a jury in this cause was selected contrary to 28 U.S.C. §§ 1861 et seq. and contrary to the United States Constitution, relying upon the evidence developed in *United States v. Curry*, CR-3–79–111, CR-3–79–112, and CR-3–79–135 (N.D.Tex., March 10, 1980).

The court concludes that the defendants are time-barred from challenging any deviation from the statutory procedures for jury selection (including any deviation from the Plan for Jury Selection adopted by the Northern District of Texas pursuant to the statute). The court also concludes that the defendants have not established by their proffer that any constitutional violation has occurred.

## I.

The statutory scheme for selection of jurors in the district courts is contained in 28 U.S.C. §§ 1861 et seq. Briefly summarized, those provisions set forth a declaration of policy "that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit *juries selected at random from a fair cross section of the community,*[1]" 28 U.S.C. § 1861 (emphasis added); prohibit exclusion on grounds of race, color, religion, sex, national origin, or economic status, 28 U.S.C. § 1862; direct each district to adopt a "written plan for random selection of grand and petit jurors that shall be designed to achieve the objectives of sections 1861 and 1862," 28 U.S.C. § 1863(a), which is required, *inter alia*, to

> specify those groups of persons or occupational classes whose members shall, on individual request therefor, be excused from jury service. Such groups or classes shall be excused only if the district court finds, and the plan states, that jury service by such class or group would entail undue hardship or extreme inconvenience to the members thereof, and excuse of members thereof would not be inconsistent with sections 1861 and 1862 of this title.

28 U.S.C. § 1863(b)(5), and to

> specify the procedures to be followed by the clerk or jury commission in assigning persons whose names have been drawn from the qualified jury wheel to grand and petit jury panels.

28 U.S.C. § 1863(b)(8); set forth the procedure for summoning, 28 U.S.C. § 1864, and qualifying, 28 U.S.C. § 1865, jury pools, and selecting and summoning jury panels, 28

---

1. This declaration of policy goes beyond the constitutional "fair cross section" requirement, see *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); section III, *infra*, requiring that the fair cross section be randomly drawn. The section

> embodies two important general principles: (1) random selection of juror names from the voter lists of the district or division in which court is held; and (2) determination of juror disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria

only. These principles provide the best method for obtaining jury lists that represent a cross section of the relevant community and for establishing an effective bulwark against impermissible forms of discrimination and arbitrariness.

H.R.Rep.No.1076, 90th Cong., 2d Sess. (1968), *reprinted* in [1968] U.S.Code Cong. & Admin. News, pp. 1792, 1793. *See United States v. Evans*, 526 F.2d 701, 706 (5th Cir.), *cert. denied*, 429 U.S. 818, 97 S.Ct. 62, 50 L.Ed.2d 78 (1976).

U.S.C. § 1866;[2] and establish procedures for challenging compliance with these requirements, 28 U.S.C. § 1867.

In sum, the statute contemplates that the venire and jury panels be randomly selected. Subsection (8) of § 1863(b) requires that the plan insure that the randomness required by § 1861 is not only the measure for choosing persons to receive the original summons, but is also the measure for breaking that pool into panels from which petit jurors are chosen in individual cases. The plan of this district implements this directive by the following language:

> From time to time, as directed by the court, the commission or clerk shall publicly draw, at random, from the qualified jury wheel the names of persons in the number required for grand and petit jury service. . . . The names of persons drawn from the qualified jury wheel shall be permanently affixed to a card suitable for jury attendance and other statistical purposes, and a list shall be prepared of such persons in the order in which they were drawn from the qualified jury wheel. Thereafter, *they shall be assigned to grand and petit jury panels in the order in which they are drawn from the qualified jury wheel, as nearly as may be practicable.*

Plan for the Selection of Grand and Petit Jurors in All Divisions of the Northern District of Texas (hereinafter "Plan") ¶ 11 (emphasis supplied). The Plan limits further excuses and exclusions after summons to those granted by the court as authorized by statute. Plan ¶ 12. *See* n. 2, *supra.*

The possible irregularities revealed by the testimony of a clerk in the District Clerk's Office of the Dallas Division[3] in *United States v. Curry* are apparently four in number. The first, second, and fourth of these claimed irregularities relate to the manner in which individual jury panels were selected, while the third apparently relates only to the seating of panel members once selected.

The clerk testified that it was her practice to note on the cards for individual jurors their possible conflicts with jury service (*i. e.,* doctor's appointments, business meetings, or trips, etc.) as those conflicts were communicated to her by telephone. She further testified that in making up jury panels for particular cases she attempted to assign jurors to panels with trial dates not conflicting with their other commitments as noted on the cards. This practice was apparently followed only as to jurors raising excuses after having been qualified, as excuses received before that time were referred to the judge in charge of qualifying

**2.** Of particular relevance is § 1866(c), which provides:

> Except as provided in section 1865 of this title or in any jury selection plan provision adopted pursuant to paragraph (5) or (6) of section 1863(b) of this title, no person or class of persons shall be disqualified, excluded, excused, or exempt from service as jurors: *Provided,* That any person summoned for jury service may be (1) excused by the court, upon a showing of undue hardship or extreme inconvenience, for such period as the court deems necessary, at the conclusion of which such person shall be summoned again for jury service under subsections (b) and (c) of this section, or (2) excluded by the court on the ground that such person may be unable to render impartial jury service or that his service as a juror would be likely to disrupt the proceedings, or (3) excluded upon peremptory challenge as provided by law, or (4) excluded pursuant to the procedure specified by law upon a challenge by any party for good cause shown, or (5) excluded upon determination by the court that his service as a

juror would be likely to threaten the secrecy of the proceedings, or otherwise adversely affect the integrity of jury deliberations. . . . Any person excluded from a particular jury under clause (2),. (3), or (4) of this subsection shall be eligible to sit on another jury if the basis for his initial exclusion would not be relevant to his ability to serve on such other jury.

**3.** There is no indication that the clerk was acting in bad faith or with intent to bias the judicial process in any way.

On January 16, 1978, ¶ 4 of the Plan was amended "to Delete the References to the Appointment of Jury Commissioners." That amendment allows the clerk to perform all tasks required in the management of the jury that the law allows. No contention has been made that this section was intended to or could delegate to the clerk the power to grant excuses. Indeed, no change in the language of ¶ 12 was made at that time.

the venire of that month. The granting of excuses by the clerk without authorization by the plan is a potential violation of 28 U.S.C. § 1866(c)(1) and Plan ¶ 12, which allow only the court to pass upon such excuses. *But see United States v. Maskeny*, 609 F.2d 183 (5th Cir. 1980) (not necessarily a substantial violation); *United States v. Evans, supra* n. 1 (same).

The clerk also testified that she attempted to avoid assigning jurors to panels if they had already served as jurors during the current month, especially if they had served in a long trial. Such a practice is likewise a potential violation of 28 U.S.C. § 1866(c)(1) and Plan ¶ 12.

Third, the clerk testified that it was her practice to seat jurors chosen for a panel to spread the jurors of each sex evenly throughout the panel. The clerk denied jurors were added to or excluded from panels on the basis of gender. There is no contrary evidence. Since 28 U.S.C. § 1861 provides in pertinent part that all litigants in Federal courts are entitled to petit juries selected *at random* from a fair cross-section of the community, this consciously nonrandom procedure may be impermissible. The procedure also potentially runs afoul of Plan ¶ 11, quoted above.

A fourth practice mentioned by the clerk is that of using those not selected for a particular jury as panelists for another jury trial starting the same day. This procedure is arguably not in accordance with the jury selection plan, which requires jurors to be assigned to grand and petit jury panels "in the order in which they are drawn from the qualified jury wheel, as nearly as may be practicable." Plan ¶ 11. In addition, this procedure may also violate § 1861 by introducing impermissible nonrandomness into the jury selection procedure.

## II.

Section 1867 sets time limits on challenges to jury selection as violative of the statutory scheme:

(a) In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.

(b) In criminal cases, before the voir dire examination begins, or within seven days after the Attorney General of the United States discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the Attorney General may move to dismiss the indictment or stay the proceedings on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.

(c) In civil cases, before the voir dire examination begins, or within seven days after the party discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, any party may move to stay the proceedings on the ground of substantial failure to comply with the provisions of this title in selecting the petit jury.

\* \* \* \* \* \*

(e) The procedures prescribed by this section shall be the exclusive means by which a person accused of a Federal crime, the Attorney General of the United States or a party in a civil case may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title. Nothing in this section shall preclude any person or the United States from pursuing any other remedy, civil or criminal, which may be available for the vindication or enforcement of any law prohibiting discrimination on account of race, color, religion, sex, national origin or economic status in the selection of persons for service on grand or petit juries.

\* \* \* \* \* \*

The "whichever is earlier" language of these sections is susceptible of two construc-

tions: that language might refer to the date of actual knowledge and the date knowledge should reasonably have been obtained, or to the first to occur of those two dates and the voir dire examination. Unless voir dire is the last time to raise questions of jury selection, post verdict assertions are not necessarily barred.

The choice between meanings is made easy by the legislative history and case law. The House Report on the Jury Selection and Service Act of 1968, Pub.L.No.90–274, § 101, 82 Stat. 59, states:

> First, the bill sets time limitations upon the availability of challenges. Subsections (a), (b), and (c) specify that challenges must be offered before the voir dire begins. And if the challenging party discovered, or in the exercise of diligence could have discovered, the grounds for the challenge earlier, the challenging motion must be made within 7 days of that earlier date.

H.R.Rep.No.1076, 90th Cong., 2d Sess. (1968), *reprinted in* [1968] U.S.Code Cong. & Admin.News, pp. 1792, 1805.

■ Case law is likewise explicit that, regardless of the date of actual or imputed knowledge of irregularities in juror selection, statutory challenges are waived if not made before voir dire. In *United States v. De Alba-Conrado*, 481 F.2d 1266 (5th Cir. 1973), the Fifth Circuit stated:

> Thus, the critical point for determining the timeliness of statutory challenges to jury selection procedures is the voir dire examination. One who fails to assert challenges before or during voir dire is foreclosed from later tardy actions which attack the validity of the jury plan.

481 F.2d at 1269. *Accord, e. g., United States v. Hawkins*, 566 F.2d 1006, 1013 (5th Cir.), *cert. denied*, 439 U.S. 848, 99 S.Ct. 150, 58 L.Ed.2d 151 (1978); *United States v. Kennedy*, 548 F.2d 608, 613 (5th Cir.) (dictum), *cert. denied*, 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977); *United States v. Grismore*, 546 F.2d 844, 848 (10th Cir. 1976); *United States v. Noah*, 475 F.2d 688, 695 (9th Cir.), *cert. denied*, 414 U.S. 1095, 94 S.Ct. 728, 38 L.Ed.2d 553 (1973); *United States v. Silverman*, 449 F.2d 1341, 1343–44 (2d Cir. 1971), *cert. denied*, 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972); *Bumpus v. Uniroyal Tire Co.*, 392 F.Supp. 1405, 1406 (E.D.Pa.1975); *United States v. Rickus*, 351 F.Supp. 1386, 1387–88 (E.D.Pa.1972), *aff'd mem.*, 480 F.2d 919 (3d Cir.), *cert. denied*, 414 U.S. 1006, 94 S.Ct. 365, 38 L.Ed.2d 243 (1973). *See United States v. Young*, 570 F.2d 152, 153 (6th Cir. 1978) (cannot be raised for first time on appeal).

■ Even were defendants not time-barred, their chances of obtaining the desired relief for any deviation from the statute or plan would not be great. 28 U.S.C. § 1867(d) provides in part:

> If the court determines that there has been a *substantial* failure to comply with the provisions of this title in selecting the grand jury, the court shall stay the proceedings pending the selection of a grand jury in conformity with this title or dismiss the indictment, whichever is appropriate. If the court determines that there has been a *substantial* failure to comply with the provisions of this title in selecting the petit jury, the court shall stay the proceedings pending the selection of a petit jury in conformity with this title.

(Emphasis added). Thus, there is room for harmless error. *See United States v. Evans, supra* n. 1, at 705. As the Fifth Circuit stated in *United States v. Maskeny, supra*, at 193, *Evans* held that:

> errors made by clerks determining excuses, exemptions, and disqualifications of potential jurors when, according to the statute, a judge should have made the determinations did not require reversing defendants' convictions as the clerk's errors did not constitute substantial failure to comply with the statute.

Though the fact pattern in *Evans* is not on all fours with this division's jury selection procedures, the holding indicates the standard of substantiality a challenging party would have to meet.

■ This legislative history and case law leaves little doubt that any statutory challenge to the irregularities at hand is now

foreclosed. This is not to say, however, that 28 U.S.C. § 1867 cuts off claims that the selection procedure offends the constitutional right to jury trial:

> [A]s this court explained in *De Alba-Conrado, supra,* forfeiture of the statutory claim in no way affects the sanctity of a defendant's due process right to be tried by a jury drawn from a fair cross section of the community.

*United States v. Kennedy, supra,* at 613–14. *See United States v. De Alba-Conrado, supra,* at 1269–70. The court now turns to the constitutional questions.

### III.

In *Thiel v. Southern Pacific Co.,* 328 U.S. 217, 220, 66 S.Ct. 984, 985–986, 90 L.Ed. 1181 (1945), the Supreme Court made clear that the representative nature of the jury is at the core of our judicial system:

> The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community . . . . This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups. Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is

an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury.

 The Supreme Court has, in criminal cases, come to rest its holdings on proper jury selection procedures on the Sixth Amendment right of a criminal defendant to be tried by an "impartial jury" and the due process clause of the Fourteenth Amendment. *Duren v. Missouri,* 439 U.S. 357, 370–72, 99 S.Ct. 664, 671–72, 58 L.Ed.2d 579 (Rehnquist, J., dissenting); *Taylor v. Louisiana,* 419 U.S. 522, 526, 528, 95 S.Ct. 692, 695, 696, 42 L.Ed.2d 690 (1975). *See also Peters v. Kiff,* 407 U.S. 493, 501–02, 92 S.Ct. 2163, 2168, 33 L.Ed.2d 83 (1972); *United States v. Maskeny,* 609 F.2d 183, 189 n.3 (5th Cir. 1980). Avoidance of the likelihood or appearance of bias, offered as reasons for nonexclusion of any large and identifiable segments from jury service as being required by due process, *Peters v. Kiff, supra,* at 501–03, 92 S.Ct. at 2168–69, holds just as well for civil cases. Thus, the Court assumes, without deciding, that a nonbiased selection procedure in civil cases is similarly compelled by the Constitution. Because of the special role of juries in criminal cases, there may be less tolerance for deviation from their representative nature than in civil cases. This opinion shows that the defendants' proffered evidence would not here prove a deprivation of the Sixth Amendment rights of a criminal defendant, and thus would not violate the constitutional requirements in a civil context.[4]

4. The court thus assumes that either equal or greater bias in jury selection would be required to establish a constitutional violation in a civil context. *But see United States v. Blackburn,* 610 F.2d 253, 263 n. 11 (5th Cir. 1980).

Jury selection, for both civil and criminal cases, can also be challenged under the equal protection clause. However, it is more difficult to demonstrate a constitutional violation relying on this clause than when, as is sometimes possible, one is relying on the

Sixth and Fourteenth Amendment. Under the equal protection clause, the challenging party may well have to be a member of the group claimed to have been excluded in order to have standing. *See Duren v. Missouri, supra,* 439 U.S. at 372, 99 S.Ct. at 672 (Rehnquist, J., dissenting). Moreover, discriminatory purpose is an essential element of violation of the equal protection clause but is not necessary under the Sixth Amendment. *Id.* at 368 n. 26, 99 S.Ct. at 670.

The constitutional right to an impartial jury is an entitlement of subtle dimensions. Litigants are entitled to a juror selection procedure or regime that, drawing ". . . from a source fairly representative of the community . . . " does not systematically eliminate a cognizable group of citizens. *Taylor v. Louisiana, supra,* 419 U.S. at 538, 95 S.Ct. at 702. Litigants are not entitled to a particular result of such a procedure:

> It should . . . be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition . . but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.

*Taylor v. Louisiana, supra,* at 538, 95 S.Ct. at 702.[5]

If the right were not to a "fair cross section procedure," (one free of a systematically eliminating bias and drawing from a representative source) but to a particular outcome, a party would be entitled to challenge his particular jury panel if it did not fairly represent the community. But, as *Taylor* holds, a party is not so entitled. It follows that the dimensions of the right to an impartial jury are described in procedural terms.

There are other indicia that the right is to a fair cross section procedure. "A criminal defendant has standing to challenge exclusion resulting in a violation of the fair-cross-section requirement, whether or not he is a member of the excluded class."

*Duren v. Missouri, supra,* at 359 n. 1, 99 S.Ct. at 666. Indeed, there is no requirement that the party challenging the jury allege that he was "unfairly treated or prejudiced in any way by the manner in which his jury was selected." *Taylor v. Louisiana,* 419 U.S. 522, 538–39, 95 S.Ct. at 702 (Rehnquist, J., dissenting). Justice Rehnquist also points out in dissent in *Duren*:

> under the majority's fair-cross-section analysis, the underrepresentation of women on jury venires in [the relevant geographical area] would entitle petitioner Duren to reversal of his conviction even if the jury chosen in his case had been composed of all women.

*Duren v. Missouri, supra,* at 373, 99 S.Ct. at 673. In analyzing a system of choosing juries under a predecessor federal statute governing jury selections, the Fifth Circuit was not moved by the representative nature of the particular grand jury encountered:

> As we said earlier, the Government argues that the indictments should stand since there were, in fact, 5 Negroes on the grand jury. We think this evidences a basic misconception. The focus of the law is on the list from which the jury is drawn and not on the composition of a particular jury or grand jury . . . . When the basic jury list was poisoned, the fruits of that list were also infected. To cure the infection, it is necessary to start the process anew.

*Rabinowitz v. United States,* 366 F.2d 34, 59–60 (5th Cir. 1966).

Describing a party's required proof for a prima facie violation of the fair cross section constitutional requirement further defines the dimensions of the right. For a party to establish a prima facie violation, he must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this

---

5. Similarly, though in the context of the Supreme Court's supervisory powers over lower courts rather than in a constitutional context, the Court wrote:

> It is likewise immaterial that the jury which actually decided the factual issue in the case was found to contain at least five members of the laboring class. The evil lies in the admitted wholesale exclusion of a large class of wage earners in disregard of high standards of jury selection.

*Thiel v. Southern Pacific, supra,* 328 U.S. at 225, 66 S.Ct. at 988.

group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. *Duren v. Missouri, supra,* 439 U.S. at 364, 99 S.Ct. at 668. Moreover, "[t]he demonstration of a prima facie fair-cross-section violation by the defendant is not the end of the inquiry into whether a constitutional deprivation has occurred." *Id.* at 367, 99 S.Ct. at 670. No such deprivation is said to occur if a "significant state interest be manifestly and primarily advanced by those aspects of the jury-selection process, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group." *Id.* at 367–68, 99 S.Ct. at 670.

In this civil case, the defendants' proffer does not establish any of the three prongs necessary to establish a prima facie violation. They have not identified a "distinctive" group which has been excluded. The challenging party "bears a heavy burden when he seeks to show systematic discrimination of constitutionally significant proportions" in jury selection cases. *See Easter v. Estelle,* 609 F.2d 756, 759 (5th Cir. 1980). The defendants' proffer does not meet this burden. This is not surprising because it would be difficult to establish any, much less all, of the three prongs.

The "dinner party" seating of the jurors has not been shown to include or exclude any "distinctive group" in the community. *See Cassell v. Texas,* 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1949). The proportion of men to women does not appear to be systematically affected by the practice.[6]

One can imagine that some cognizable group might be excluded as a result of the practice of not assigning jurors to panels if they had already served as jurors during the current month or as a result of the practice of using those not selected for a particular jury starting the same day. The court suspects that this would be unlikely; regardless, nothing in the proffer makes this proof.

Similarly, the practice of the clerk accommodating conflicts between trial dates and jurors' appointments is unlikely to result in the exclusion of a "distinctive" or "cognizable" group. *Duren v. Missouri, supra,* 439 U.S. at 364, 99 S.Ct. at 668; *United States v. Goodlow,* 597 F.2d 159, 162 (9th Cir.), *cert. denied sub nom. Wallace v. United States,* 442 U.S. 913, 99 S.Ct. 2830, 61 L.Ed.2d 280 (1979). Though older people might tend to have fewer business appointments, and so they may be overrepresented, they might also have more medical appointments, resulting in little net effect.

Moreover, it is not clear that age groups are constitutionally cognizable. Courts have often held, for instance, that "young adults 18–20 years of age do not constitute a cognizable group within the community whose exclusion from the jury rolls amounts to an error of constitutional dimensions." *United States v. Geelan,* 509 F.2d 737, 741 (8th Cir. 1974), *cert. denied,* 421 U.S. 999, 95 S.Ct. 2396, 44 L.Ed.2d 666 (1975). Relying on this line of cases, at least one court has held that the retired and the young are not cognizable. *United States v. Armsbury,* 408 F.Supp. 1130, 1137 n. 5 (D.Or.1976). *But see Simmons v. Jones,* 317 F.Supp. 397, 404 (S.D.Ga.1970), *rev'd on other grounds,* 478 F.2d 321 (5th Cir. 1973), *modified,* 519 F.2d 52 (5th Cir. 1975).

Groups of a given economic status can be cognizable. For instance, exclusion of wage earners can, in certain circumstances, be violative of the Constitution. *See United States v. Blackburn, supra,* at 272. *See also* Kairys, *Juror Selection: The Law, A Mathematical Method of Analysis, and A Case Study,* 10 Am.Crim.L.Rev. 771, 780–81 (1972). Defendants' proffer does not show and it is unlikely that it could be shown that the challenged excuse system would result in disproportionate representation of people of any particular economic status. The unemployed worker will make appointments to interview for jobs, just as a beau-

---

6. There would appear to be little unfairness to a litigant from this seating arrangement. Certainly there is no suggestion that it systematically excludes a cognizable group.

tician or a business executive may set up appointments with clients. In sum, our common experience points to the conclusion that it is unlikely that a party can here show systematic exclusion of any cognizable group.

As the second and third essential elements in the prima facie case, the challenging party would have to show that the *procedure* used for selection of jurors both generally and in his particular case is such that representation of "distinctive" groups in juries would not be fair and reasonable in relation to the number of such persons in the community. *Duren v. Missouri, supra,* 439 U.S. at 364 and 366, 99 S.Ct. at 668 and 669.[7] The disparity between a group's representation in the jury system and its representation must be large enough to be constitutionally impermissible. *See United States v. Maskeny, supra,* at 190; *United States v. Butler,* 611 F.2d 1066, 1069–70 (5th

Cir. 1980). Defendants have proffered no such proof.

Even if a challenging party were able to establish all three elements of the prima facie case, the jury selection procedure may be constitutionally permissible if a significant state interest is manifestly and primarily advanced by those aspects of the jury selection process which result in the disproportionate exclusion of a distinctive group. *Duren v. Missouri, supra,* at 367–68, 99 S.Ct. at 670–71. Without deciding the issue at this time, the government has a legitimate interest in easing the inconvenience of jury duty by working around individual jurors' schedules. Apart from the availability of such a defense to a prima facie case, it need not be forgotten that the fact that a clerk of the court and not the judge was dealing with these individuals' schedules does not in itself raise constitutional problems. Only if the clerk adopted too permissive a standard for excuses might

7. As earlier noted, it is not necessary that the challenging party's jury be of a particular composition in order to raise the constitutional challenge. Concededly, there is language in *Duren* which might be interpreted as requiring nonrepresentativeness on one's particular venire: " . . . in order to establish a prima facie case, it was necessary for petitioner to show that the underrepresentation of women, generally *and on his venire*, was due to their systematic exclusion in the jury-selection process." *Id.* 439 U.S. at 366, 99 S.Ct. at 669 (emphasis supplied). But such an interpretation would be a dubious one, even if one confined oneself to looking at that opinion itself. That passage could be better interpreted as requiring that the regime used both generally and in his case be such that biased juries would result, not that the particular result happened to be unrepresentative. After all, the second element of the prima facie case is "that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community." *Id.* at 364, 99 S.Ct. at 668 (emphasis added). Moreover, in its analysis of the challenged system under the second element, the Court looked only at the tendency of the procedure to produce unrepresentative juries, and did not examine the composition of Duren's own jury. *Id.* at 364–66, 99 S.Ct. at 668–69.

The focus then, is on the regime under which one's jury is picked. If the regime used could be expected to lead to biased results in one's type of case—even if the actual jury received may be fully representative—one has standing to challenge that regime. However, if the regime used would not lead to impermissible results, then one has nothing to challenge. We have already discussed the irrelevance of the dinner party arrangement for constitutional analysis. That class of cases which were tried at the beginning of the month (without any excuses having been granted by a clerk and not the cutback of an earlier panel), are in essence being operated under a different regime from cases outside the class. The regime of jury selection in the first class leads to representative juries in that class while the regime of jury selection in the second class might not lead to representative juries in the second class. Litigants in the first class of cases have no standing to raise the constitutional claims of those in the second class. This is apart from the difficulties of proving any constitutional violation by a party with standing.

a constitutional issue be raised[8] and then only if a systematic exclusion of cognizable group resulted. No evidence of such has been proffered.

### Conclusion

There is a world of difference between the granting of a mistrial motion at the beginning of a lengthy trial and the setting aside of civil judgments and criminal convictions long since returned. In *United States v. Curry*, approximately one-half of the panel had been excused by the clerk. Twelve persons with prior jury service in the month were excused and the remaining 52 were seated in a nonrandom way (as to sex). The mix of jurors chosen gave an appearance of confirming that the procedure used was a nonrandom one and one where certain groups might be disproportionately represented. In a much publicized prosecution of persons of prominence, this result created such an appearance of injustice as to demand a swift corrective hand.

To overcome a verdict of a jury whose membership has been accepted by one's lawyer without a murmur of protest when the trial was fair in other respects, requires that a citizen prove he has been deprived of his constitutional jury rights. That is, only if a person has been so deprived ought he to obtain relief. It is equally true that proof of a technical variation from statutory provisions not rising to the level of constitutional violations ought not overcome our strong policies of repose and finality. Those who have been fairly tried and have lost at the hands of civil or criminal juries in this district may have had their expectations of escape from justice raised by the publicity surrounding recent events, but that expectation was falsely raised. Errors have been made, but absent proof as outlined here, the keys to the prisons remain in the jailer's hands and the writs of civil execution in those of the Marshal.

For the foregoing reasons, defendants Harris' and Connell's Motion for Mistrial and all relief prayed for therein are DENIED.

---

8. *Cf. United States v. Maskeny, supra*, at 193–94.