609 F.2d 183
 UNITED STATES of America, Plaintiff-Appellee,
v.
Donald George MASKENY, Lee Durwood Harvey, Mark Timothy
Perkins, Joseph Charles Blackburn, Sr., Charles Michael
Crocker, Kenneth Murchison, Sidney Larry Pernell, Barry
Wayne Toombs, Tony Darwin and Julian Thomas Pernell,
Defendants-Appellants.
 No. 78-5596.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 4, 1980.
Rehearing and Rehearing En Banc Denied Feb. 14, 1980.
 
 William H. McAbee, II, Katherine L. Henry, David Roberson, Asst. U.S. Attys., Savannah, Ga., for plaintiff-appellee.
 Mellissa S. Mundell, Asst. U.S. Atty., Savannah, Ga. (on jury selection issues) for plaintiff-appellee.
 Carleton L. Weidemeyer, Clearwater, Fla., for Maskeny.
 J. Flowers Mark, Alexandria, Va., for Harvey.
 John Kenneth Zwerling, Jonathan Shapiro, Alexandria, Va., for Perkins.
 Frank A. Mika, Arthur S. Meisnere, Washington, D.C., for Blackburn, Crocker, Murchison, Pernell & Toombs & Pernell.
 Donald G. Doddington, Roger V. Rigau, Tampa, Fla., for Darwin.
 Appeal from the United States District Court for the Southern District of Georgia.
 Before COLEMAN, Chief Judge, TJOFLAT and HILL, Circuit Judges.
 COLEMAN, Circuit Judge.
 
 
 1
 Somewhere around 10 o'clock, P. M., March 6, 1978, Pilots (appellants) Darwin and Maskeny, accompanied by defendant Perkins, landed a twin engined airplane at the Sylvania, Georgia public airport, loaded with 3,623 pounds of marijuana. They were met with an entirely unexpected welcome from United States Customs Agents and Georgia state officers who had been awaiting their arrival.
 
 
 2
 The other defendants (appellants), also expecting the arrival, had stationed themselves and their trucks in the adjacent woods. They rushed to the plane and quickly transferred the cargo, after which they set out for Washington, D.C., only to be intercepted by other officers who had been waiting down the road. No ambush was ever more successfully laid or executed.
 
 
 3
 This happened because from the outset some of the participants unwittingly had been dealing with an undercover government agent who had been kept informed of everything that went on. Indeed, these conspirators were so gullible that an agent had no difficulty in leading them to believe that He was the owner of the publicly owned Sylvania airfield. While most everybody has heard of wooden nutmegs and of the Brooklyn Bridge, two of the conspirators actually paid the agent $2,000, cash in advance, for the privilege of landing their clandestine cargo on "his" airfield.
 
 
 4
 The defendant who had initiated the scheme with the government agent, and who handed over the $2,000 supplied by one of the others, quickly saw that he was irretrievably caught in the jaws of the lion, so he pleaded guilty. He testified for the prosecution, corroborated everything that the agent had sworn to, and wobbled only as to whether it was in November or December that he had received his first contact from one of the other conspirators, an immaterial matter in light of the evidence in the case. Defendant Kraince also pleaded guilty. The proof was annihilating but the remaining ten men stood trial to a jury. They were represented by skilled and tenacious trial counsel, who generated towering columns of smoke despite the absence of useful combustibles. Whatever else may be said of this case, the defendants did not suffer for the lack of counsel who were both competent and energetic.
 
 
 5
 The presence of so many defendants and so many lawyers generated a bloated trial record. After oral argument and an exploration of that record we are altogether convinced that the judgment of the District Court must be affirmed.
 
 
 6
 Darwin, Maskeny, Meycher, Perkins, Julian Thomas Pernell, Sidney Larry Pernell, and Barry Wayne Toombs were indicted for conspiracy to import 3,623 pounds of marijuana from outside the United States. The indictment further charged that when the contraband arrived, Blackburn, Crocker, Harvey, Kraince, Meycher, Murchison, the two Pernells, Toombs, Darwin, and Maskeny participated in unloading the marijuana from the aircraft.
 
 
 7
 Count 2 charged Darwin, Maskeny, Meycher, Perkins, the two Pernells, and Toombs with importation and causing importation.
 
 
 8
 Count 3 charged all defendants with conspiring to possess with intent to distribute, while Count 4 charged all named defendants with actual possession with intent to distribute.
 
 
 9
 The relevant statutes are: 21 U.S.C., Sections 841(a)(1), 846, 952(a), 960, and 963; 18 U.S.C., Section 2.
 
 
 10
 All defendants were found guilty on all charges.[1]
 
 
 11
 On January 7, 1978, William A. Wallace, Jr., an employee of the United States Customs Service, met at the Savannah airport with Jesus Manuel Meycher (who later pleaded guilty), Barry Wayne Toombs, Julian Pernell, and Frank Landry. Landry, an airplane pilot and locator from Florida, had informed Wallace that some people were interested in finding a clandestine air landing strip in Georgia, that these people would be in Savannah on January 7, and wondered if Wallace could get together with them and show them such an airfield. Wallace pretended to be the owner, in full control, of the Sylvania airport. The boundary lights could be turned on and off; "we knew the area including backroads". GBI Agent Claude Clardy went with Wallace and the others on the exploratory trip to the Sylvania airfield, about a ninety minute drive from Savannah. Meycher, Toombs, Pernell, and Landry pronounced the field satisfactory after a ten minute observation. They returned to Savannah.
 
 
 12
 Meycher asked Wallace if he could come down to Miami the next day to pick up the $2,000 "good faith" money, giving him $200 with which to purchase the airline ticket. Wallace went to Miami, where he met with Meycher, Julian Pernell, and Larry Pernell, and got the $2,000. At the first meeting, the parties informed Wallace that the aircraft Would be coming from Colombia. It would be a large four engine type airplane, probably a DC-6, and would be transporting approximately 20,000 pounds of marijuana. They needed nothing from Wallace but the clandestine airstrip. Julian Pernell said that they had their own trucks, that they would be using two twenty foot sealed vans. They would have drivers in uniforms and bills of lading in case they hit a roadblock.
 
 
 13
 At Meycher's invitation, Wallace was back in Miami on March 3, where he met Meycher at the Marriott Hotel in a meeting that was surveilled by two DEA Agents. Meycher said that the 20,000 pound airplane deal had fallen through but a smaller airplane would be coming in, wishing to know if Wallace had any objections to that. Of course, Wallace had none. He gave Meycher a previously requested aviation chart for the Sylvania airfield and Meycher asked him to call him later. No other defendant was present at this meeting.
 
 
 14
 Wallace talked to Meycher by telephone on March 4. Meycher said that "the deal was set" and that they wanted to go ahead with it on Monday or Tuesday. At approximately midnight on March 5 Wallace was again in touch with Meycher at Howard Johnson's in Savannah, who asked Wallace to meet him the next morning, saying that everybody was in town.
 
 
 15
 That next morning, Wallace and GBI Agent Clardy met with Meycher at the Howard Johnson, where Meycher again said that everybody was in town, that the deal was set to go that night. After breakfast, Meycher, Wallace, and Clardy went across the street to the Ramada Inn and met Julian Pernell and Barry Toombs. All five men got in a rental car and drove around "to further discuss the deal". Julian Pernell at that time stated that the DC-6 deal was off, that they had a smaller twin engine aircraft that would be coming into the field. Julian Pernell said that they had four pickup trucks at various motels "so they would not draw heat", that they were of the four wheel drive type which would be used to transport the load from the airfield. Toombs said that the load was going to Washington. As the parties drove back in at the Ramada, Julian Pernell pointed out one of the vehicles.
 
 
 16
 During the ride there was some discussion that the aircraft would be in between 9 and 10 o'clock that night.
 
 
 17
 At that point Toombs, Pernell and Meycher were dropped off.
 
 
 18
 At 5 o'clock that afternoon Meycher, Julian Pernell, and Toombs met with Wallace and Clardy at the Ramada Inn restaurant. At 6 o'clock the parties left for the Sylvania airfield. Barry Tombs went to Sylvania with Customs Agent Wallace in an undercover GBI truck, followed by Julian Pernell, driving another truck. Upon arrival at Sylvania another truck was already present, in the woods about a half mile from the runway. There were four 4 wheel drive pickup trucks at the scene, equipped with camper shells and CB radios.
 
 
 19
 As the marijuana laden aircraft approached the airport it announced its approach on the UNICOM located inside the "terminal". Those present at the hangar area were Clardy, defendant Harvey, defendant Meycher, and defendant Larry Pernell. The trucks were brought in and "everybody except Darwin and Maskeny were loading the vehicles". Perkins and Harvey passed the bales out. The aircraft was unloaded. Perkins and Harvey vacuum cleaned the interior, during which time Customs Agent Wallace heard Perkins say "I just made a long trip from Colombia and I want to get out of here". (Vol. 1, p. 252)
 
 
 20
 While the others started off in the trucks Darwin, Maskeny, Harvey, and Perkins remained with the aircraft, after which they were arrested and taken inside the terminal.
 
 
 21
 The defendant, Jesus Meycher, who had been conducting the arrangements with Agent Wallace and who later pleaded guilty was thirty-two years old, an American citizen, resident of Tuscon, Arizona, a high school graduate, with a year of school in Mexico.
 
 
 22
 The government agreed to recommend probation in return for his testimony. He pleaded guilty to two counts
 
 
 23
 According to Meycher, in December, 1977, in Tucson, he was contacted by the defendant Barry Toombs, who needed an airplane to smuggle marijuana from Colombia to the United States. He was to be paid $80,000 to get the plane and the pilots. He met Barry Toombs and Julian Pernell in Miami, Florida, in January, 1978, whence he had gone to look for a big airplane. He had gone to see "Frank" (Landry). He also discussed a landing place in the United States with Frank Landry. Landry, Pernell, and Toombs accompanied Meycher to Savannah, where they met Clardy and Wallace. Wallace claimed to be the owner of the airport and Clardy was its manager. Meycher informed them that he needed a 4600 foot paved runway. Wallace had taken them to the Sylvania airport, where they checked the runway, the hangar, and the back road. The airfield was satisfactory to Pernell and Toombs.
 
 
 24
 On January 8 he gave Wallace $200 in Savannah to get to Miami. Along with Landry, Meycher met Wallace at the Marriott Hotel in Miami and paid Wallace $2,000 as good faith money. He got the money from Julian Pernell. Julian Pernell had given Meycher $10,000 on January 8 at a time when Larry Pernell was present. Meycher gave the remainder of the money to Frank Landry as a good faith deposit on the plane they were trying to obtain. He confirmed that Wallace gave him the aerial chart of the Sylvania airport. He did not know all of the members of the conspiracy until they were arrested in Sylvania.
 
 
 25
 On the day the plane was to arrive in Sylvania, Julian Pernell said the lighter plane would be able to land in Colombia.[2]
 
 
 26
 Along with Larry Pernell and GBI Agent Clardy, Meycher went to Sylvania to await the arrival of the marijuana plane. When the plane arrived, Perkins jumped out and the trucks started arriving. He saw the pilots and one of them had a brief case (Vol. 2, p. 336). After the marijuana had been off-loaded into the trucks, everybody helping but the pilots, Meycher left the airfield with the Pernell brothers and Toombs, but they were arrested when they got to the paved road.THE ATTEMPTED DEFENSES
 
 
 27
 In United States v. Gaines, 489 F.2d 690 (1974), we held as follows:
 
 
 28
 "Noting that the federal statutory definition of marihuana refers only to Cannabis sativa L., Gaines calls our attention to the fact that while the Government's expert chemist agreed that there are three species of marihuana, i. e., Cannabis sativa L., Cannabis indica and Cannabis ruderalis, the chemist was unable to differentiate between the three. Building upon the premise that Cannabis sativa L. is the only species of marihuana expressly prohibited by statute, Gaines argues that the court's refusal to give the jury an instruction containing the statutory definition of marihuana deprived the jury of considering whether the Government's expert was sufficiently trained and whether he sufficiently tested the substance to prove beyond a reasonable doubt that in fact the substance examined was Cannabis sativa L. and not Cannabis indica.
 
 
 29
 "The Third Circuit recently considered the issue raised by Gaines and concluded that Cannabis indica is included within the statutory definition of marihuana. United States v. Moore, 3 Cir., 1971, 446 F.2d 448. Similarly, the Second Circuit, while recognizing the possibility that there may be some botanical opinion that Cannabis is polytypal, found that there is no question but that the lawmakers, the general public and overwhelming scientific opinion considered that there was only one species of marihuana . . . Whether this is scientifically exact or not, the statute provided at the time of the offense a sufficient description of what was intended to be prohibited to give notice to all of the illegality of appellant's actions. United States v. Rothberg, 2 Cir., 1973, 480 F.2d 534, 536.
 
 
 30
 "We are in full agreement with what has been said by our sister Circuits, and thus find no error in the district court's refusal to instruct the jury with respect to the statutory definition of marihuana."
 
 
 31
 This view is supported by the following cases: United States v. Honneus, 1 Cir., 1974, 508 F.2d 566; United States v. Gavic, 8 Cir., 1975, 520 F.2d 1346; United States v. Kelly, 9 Cir., 1976, 527 F.2d 961; United States v. Spann, 10 Cir., 1975, 515 F.2d 579; United States v. Walton, D.C. Cir., 1975, 168 U.S.App.D.C. 305, 514 F.2d 201.
 
 
 32
 Therefore, the District Court should not have entertained, or allowed, the protracted contentions of the defense to the effect that the marijuana taken from the captured plane was of "a species" different to Cannabis sativa L. The vigorous arguments on behalf of this theory and as to the jury instructions sought with reference to it must be rejected.
 
 
 33
 The same must be said of the controversy which continuously and lengthily swirled around the warrantless search of a briefcase found on a counter inside the airfield "terminal" at a time when the pilots were present and after they had been arrested and given their Miranda warnings. GBI Agent Clardy testified that he saw Pilot Darwin carrying a briefcase when he got off the plane. The customs agent who first noticed a briefcase on the counter and seized it testified on a motion to suppress that when she inquired as to who the briefcase belonged to everybody remained silent. Another witness testified that the defendants said that it did not belong to them. Much time was spent on whether the defendants were required to say anything when they obviously had a right to remain silent, bearing on whether the briefcase had been abandoned at the time it was seen and seized by the customs agent. In the totality of this record, this was all beside the point. The District Judge found, and the record amply supports this finding, that the briefcase was, in fact, brought off the plane by one of the pilots. The customs agents had every reason to believe, and no reason to doubt, that this plane, transporting marijuana, had landed after a flight from outside the United States, United States v. Ingham, 5 Cir., 1974, 502 F.2d 1287. All along, it was well known that the contraband was to come from Colombia. On the day the plane landed it was mentioned by one of the conspirators in the presence of the agent that the plane, enroute, would probably stop in the Bahamas. While the cargo was being unloaded in Sylvania, one of the men who had flown in with the plane volunteered that he had had a tiresome flight from Colombia and he wanted to get out of there.
 
 
 34
 The legality of the warrantless search of this briefcase by a customs agent is governed by what the Supreme Court said in Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973):
 
 
 35
 "For another example, a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search", 413 U.S. at 273, 93 S.Ct. at 2539.
 
 
 36
 "That searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border, should, by now, require no extended demonstration."
 
 
 37
 United States v. Ramsey, 431 U.S. 606, 616, 619, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977).
 
 
 38
 Neither do we see any merit in the point that the briefcase was first taken by officers to a nearby town before being there broken open and searched by a customs officer. There is absolutely nothing to indicate that the briefcase had been tampered with in transit or that the discoveries would have been any different if the briefcase had been opened as soon as it was found.
 
 
 39
 The complaint about juror O'Neal being the husband of the trial judge's secretary is equally without merit. The record reveals that under voir dire questioning by counsel for one of the defendants Mr. O'Neal stated that his wife was "a secretary with this Court", that he did not feel that his wife "being connected with the Court itself would in any way influence (his) judgment about the evidence that would be presented". None of defense counsel pursued the subject but Mr. O'Neal was extensively questioned about his views and attitudes as a tobacco salesman. He was not challenged for cause and he was not peremptorily challenged. Counsel for the appellants were on specific notice of the status of the juror's wife and made no effort to have him excused. It is too late now to complain about this.
 
 
 40
 Appellants assert, as they did before trial in the district court, that the selection process for the grand and petit juries in the southern district of Georgia violated the Constitution and 28 U.S.C.A. §§ 1861-1869, the Jury Selection and Service Act. We have carefully examined appellant's arguments on this issue and, for the reasons set forth below, find them without merit.
 
 A. The Constitutional Challenge
 
 41
 In Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the Supreme Court stated that a defendant's sixth amendment right to a petit jury selected from a fair cross-section of the community is violated when there is a systematic disproportion between the percentage of a "distinctive" group in the community and its representation in venires from which juries are selected, unless the state shows that the aspects of the process that result in the disproportion manifestly and primarily advance a significant state interest, Id. 99 S.Ct. at 668-71 and 670 n.26.[3] The Court clearly set out the elements of a prima facie violation of the fair cross-section requirement: the defendant must show "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." Id. at 668.
 
 
 42
 Appellant has alleged that the proportion of various groups responding to a jury service questionnaire and being placed on the qualified wheel varies to a constitutionally impermissible degree from the proportion of these groups in the community. We need not decide whether each of these groups is "distinctive" for purposes of a jury challenge[4] as we find that appellant has failed to make out a case of a constitutionally impermissible disproportion.
 
 
 43
 According to appellant's statistics, the disparity between the percentage of each allegedly "distinctive" group in the community and the percentage of that group either returning questionnaires or ending up on the qualified wheel is less than ten percent. The Supreme Court in Swain v. Alabama, 380 U.S. 202, 208-09, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), held that underrepresentation by as much as ten percent did not show purposeful discrimination based on race. We recognize, however, that Swain was an equal protection case where purposeful discrimination must be shown and that the Court in Duren stated that a defendant need not show discriminatory purpose for a sixth amendment violation. The Court in Duren, however, discussed the statistical discrepancy needed to make out an equal protection violation along with its discussion of the disproportion that demonstrates a sixth amendment violation, 99 S.Ct. 670 n.26. Thus, while the Court stated that statistical evidence is used to prove Different elements in equal protection and sixth amendment claims, it did not indicate that the necessary amount of disparity itself would differ. This Court in Thompson v. Sheppared, 490 F.2d 830 (5th Cir. 1974), Cert. denied, 420 U.S. 984, 95 S.Ct. 1415, 43 L.Ed.2d 666 (1975), upheld a system that resulted in an eleven percent disparity between the percentage of black people in the population and black people on the jury list. Appellant urges that we either find that an absolute disparity below ten percent violates the constitution or that we base our decision on data derived from other statistical methods, specifically comparative disparity or disparity in standard deviations. It is true that the Supreme Court in Castaneda v. Partida, 430 U.S. 482, 496 n.17, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), discussed disparity in standard deviations, but it seems clear to us that the Court in that case based its holding on an absolute disparity of 40 percent between the population of Mexican-Americans in the community and the percentage summoned for jury service, Id. at 495, 97 S.Ct. 1272. In fact, the Court specifically noted that the actual disparities earlier accepted by the Court as adequate for a prima facie case[5] had all been within the range presented in Castaneda, id. at 496, 97 S.Ct. 1272. This Court as well has referred to statistical methods other than absolute disparity,[6] but has never found a constitutional violation based on the data produced by such methods. Finally, the Supreme Court focused on absolute disparities in Duren, supra. Appellant argues that reliance on absolute disparity could lead to approving the total exclusion from juries of a minority that comprised less than ten percent of the population of the community. We need not, however, speculate here on how we would treat such a situation for all the groups analyzed in appellant's statistics comprise more than ten percent of the community.
 
 
 44
 In sum, we decline appellant's invitation to focus on comparative or standard deviation disparity and find that the absolute disparities shown do not make out a constitutional violation.B. The Statutory Challenge
 
 
 45
 The statute itself declares that the ground for a challenge to jury selection procedures is "substantial failure to comply with the provisions of this title," 28 U.S.C.A. § 1867. This Court in United States v. Davis,546 F.2d 583, 589 (5th Cir. 1977), Cert. denied, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977), stated, "Determining the substantial compliance question requires that the alleged violations of the Act be weighed against the goals of the statute." The Court identified the major goal of the statute as the random selection of juries from a fair cross-section of the community; toward that end voter lists are to be the primary source of jurors' names and disqualifications, excuses, exemptions, and exclusions are to be based solely on objective criteria, Id. The Court then held that one aspect of the selection process there under review constituted a technical violation of the statute but that the violation in no way affected the random nature or objectivity of the selection process and therefore did not constitute a substantial failure to comply with the statute. In United States v. Goff, 509 F.2d 825 (5th Cir. 1975), Cert. denied, 423 U.S. 857, 96 S.Ct. 109, 46 L.Ed.2d 83 (1975), this Court stated that to sustain a statutory challenge to grand jury selection procedures, a defendant must show the impact of an absolute disparity on the jury list. Specifically, although a group might be 47.73% Underrepresented on a voter registration list, at most this disparity would result in 1.4 fewer persons on a twenty-three person grand jury than if the group's percentage of the population of the community (there 10.51%) were mirrored on a grand jury. This potential impact on a grand jury was held not to be so substantial as to require a supplementation of voter registration lists with other sources for grand jurors. Id. at 827.
 
 
 46
 As we read appellants' brief and the record, appellant alleges as statutory violations: (1) an allocation of grand jury seats among the divisions that did not reflect the population of those divisions and resulted in the underrepresentation of service workers and therefore of black people; (2) that the voter registration lists were an inadequate source of jurors because of a low rate of return of questionnaires (due in part to the absence of voters' addresses), and that a supplemental source of potential jurors was required; (3) that the one-year district residency requirement is unconstitutional; (4) that the ministerial exemption or its application violated the first amendment; and (5) that the clerk and Administrative Office of the United States Courts usurped the function of the district judge in excusing jurors in violation of the statute. We treat these claims seriatim.
 
 
 47
 Appellants assert that one division in the district had three fewer seats on the grand jury than its population would warrant and goes on to speculate that black people had recently moved into this division and become service workers and were consequently underrepresented. They fail to show the impact of this alleged misallocation of seats on representation of the particular groups on the jury list. The government in its brief has shown that the alleged underrepresentation of the groups on which appellant focuses falls far short of the impact held insubstantial in Goff, supra. Brief for Appellee, at Appendix III.
 
 
 48
 Appellant cites two opinions of this Court for the proposition that voter lists must be supplemented when too few questionnaires are returned.[7] As appellee correctly points out, Brief for Appellee, at 50-51, both of these cases dealt with appropriate remedies for selection processes that had been found to be discriminatory. Subsection (b)(2) of 28 U.S.C.A. § 1863 specifically provides for selection of prospective jurors from voter registration lists adding: "The plan shall prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title." Id. The law review article, cited by appellant, which advocates greater use of other sources states:
 
 
 49
 At present only two federal district courts and several state courts utilize multiple lists and no court has either required multiple lists or supplemented a primary list on constitutional or statutory grounds. Most decisions require proof of purposeful discrimination in jury selection, even though constitutional and statutory authority indicates that proof of a significant disparity between the composition of the population and the source or pool constitutes a prima facie case of invalidity. Other cases require proof that the underrepresentation resulted in a 'substantial impact' on the absolute number of minority members serving on a panel. . . .
 
 
 50
 Kairys, Kadane & Lehoczky, Jury Representatives: A Mandate for Multiple Source Lists, 65 Cal.L.Rev. 776, 778 (1977). Responding to a statutory challenge to a grand jury, this Court in Goff found that in enacting the statute Congress
 
 
 51
 felt that utilization of voter registration lists as the primary source of names for the master jury list would provide a more representative cross section of the community. That body recognized that in some instances, failure of particular groups in a community to register would mean that the voter registration list would not accurately represent a fair cross section of the community. But where, as in this case, the impact of the underrepresentation does not substantially affect the composition of the average grand jury, the Act does not require the district to incur the substantial expense and administrative inconvenience necessary to supplement the voter registration list.
 
 
 52
 509 F.2d 825, 827. In Camp v. United States, 413 F.2d 419 (5th Cir.), Cert. denied, 396 U.S. 968, 90 S.Ct. 451, 24 L.Ed.2d 434 (1969), appellant challenged both the grand jury and the array of petit jurors alleging that voter registration lists did not constitute a representative cross-section because a particular religious group did not register to vote. The court noted that the statute requires the use of voter registration lists under district jury plans, adding:
 
 
 53
 Plans, if approved, may require supplemental sources if needed to assure a fair cross-section of the community. But the principal, if not sole, source is to be voter registration lists for random selection. Use of such lists as the sole source of names for jury duty is constitutionally permissible unless this system results in the systematic exclusion of a 'cognizable group or class of qualified citizens.'
 
 
 54
 Id. at 421. See also United States v. Dangler, 422 F.2d 344, 345 (5th Cir. 1970). Because we find that appellants have not shown either that the use of voter registration lists has a substantial impact on the composition of the average grand jury or that their use results in the systematic exclusion of a cognizable group from jury source, we find this claim to be without merit.
 
 
 55
 The statute itself, 28 U.S.C.A. § 1865(b)(1) requires that a juror have resided in the district one year. This Court upheld the constitutionality of this statutory requirement in United States v. Perry, 480 F.2d 147, 148 (5th Cir. 1973) and we do not agree with appellants' assertion that certain passages in Duren, supra, require a contrary holding.
 
 
 56
 We also find that the ministerial exemption as it exists in the local plan and as it was administered in the district, does not violate the statute or the Constitution. Section 1861 of the statute declares that it is the policy of the United States that all citizens have the opportunity to be considered for jury service and an obligation to serve when summoned. Section 1862 prohibits exclusion from jury service on account of, Inter alia, religion. Subsection (b)(5) of section 1863 provides that a jury selection plan shall
 
 
 57
 specify those groups of persons or occupational classes whose members shall, on individual request therefor, be excused from jury service. Such groups or classes shall be excused only if the district court finds, and the plan states, that jury service by such class or group would entail undue hardship or extreme inconvenience to the members thereof, and excuse of members thereof would not be inconsistent with sections 1861 and 1862 of this title.
 
 
 58
 The local plan for the Southern District of Georgia includes the following:
 
 EXCUSES ON INDIVIDUAL REQUEST
 
 59
 This court finds and hereby states that jury service by members of the following occupational classes or groups of persons would entail undue hardship and extreme inconvenience to the members thereof, and serious obstruction and delay in the fair and impartial administration of justice, and that their excuse will not be inconsistent with the Act and may be claimed if desired, and shall be granted by the Court upon individual request: (1) all ministers of the gospel and members of religious orders actively so engaged . . . .
 
 
 60
 Appellants urge that the effect of the administration of this exemption in the Southern District of Georgia was to exclude all Jehovah's Witnesses in violation of section 1862 of the statute and the establishment clause of the first amendment.
 
 
 61
 Appellants first assert that all members of the Jehovah's Witnesses sect consider themselves ministers. They urge that the standard for ministerial exemption (vocation not avocation) developed in cases dealing with military service applies here. They continue by noting that some persons who were excused as ministers did not list minister as their occupation in their jury questionnaire and that some of these people identified themselves as Jehovah's Witnesses. Finally they note that those who were excused as ministers but did not list their occupation as "minister" comprised 3.5% Of all exclusions in the district and 7% Of all exclusions in one district. We find that granting ministerial exemptions to those who so request but do not list their occupation as minister does not, alone, constitute exclusion from jury service on account of religion. We further find that appellants have failed to show that the operation of the ministerial exemption in the Southern District of Georgia relieves all members of any particular sect of jury service, thus we need not reach appellants' first amendment claim. We further note that in Camp v. United States, 413 F.2d 419 (5th Cir. 1969), Cert. denied, 396 U.S. 968, 90 S.Ct. 451, 24 L.Ed.2d 434 (1969), this Court rejected a challenge to the cross-section requirement based on grounds similar to the present claim. Appellant asserted that Jehovah's Witnesses do not register to vote and this Court upheld the use of voter registration lists noting that "those who do not choose to register to vote cannot be considered a 'cognizable group,' " Id. at 421. In United States v. Henderson, 526 F.2d 889 (5th Cir. 1976), this court rejected a challenge to an exemption for "one man" businesses noting that the exemption was not automatic but based on individual requests and relying in part on the element of choice present in Camp.
 
 
 62
 Finally, appellants assert that their convictions be reversed because persons other than judges performed functions in excusing jurors, functions that the statute requires the district judge to perform. This Court dealt with a very similar claim in United States v. Evans, 526 F.2d 701 (5th Cir. 1976), Cert. denied, 429 U.S. 818, 97 S.Ct. 62, 50 L.Ed.2d 78 (1976), and held that errors made by clerks determining excuses, exemptions, and disqualifications of potential jurors when, according to the statute, a judge should have made the determinations did not require reversing defendants' convictions as the clerk's errors did not constitute substantial failure to comply with the statute, Id. at 704-07. It is true that in Evans nearly all the errors resulted in Inclusion of persons who possibly should have been relieved of jury duty. While the record here does indicate that the clerk may indeed have made determinations that by statute the judge should have made, the appellants do not show that the clerk made Erroneous determinations. Their allegations fall far short of showing a Substantial failure to comply with the statute. We therefore find no basis for reversing the defendants' convictions on this ground.
 
 
 63
 AFFIRMED.
 
 
 
 [1]
 Stated in abbreviated form, the sentences imposed were as follows:
 Darwin 36 months; 4 years special parole.
 Maskeny 30 months; 4 years special parole.
 Toombs and Sidney Larry Pernell a year and a day. Supervised probation 4 years. Special parole 4 years.
 Julian Thomas Pernell 6 months; $5,000 within 1 year; supervised probation for 3 years; special parole term 2 years.
 Murchison 6 months. Special parole term 4 years. Supervised probation 3 years.
 Harvey and Mark Perkins 6 months; 4 years special parole.
 Crocker 6 months; special parole 3 years.
 Blackburn Sentence suspended; supervised probation 3 years.
 
 
 [2]
 Landry testified that he had flown to Colombia to look at the airstrip on which the DC-6 was to land to pick up the marijuana. He concluded that no DC-6 could land on that strip. That was what "blew up" the DC-6 plan, resulting in the use of the lighter aircraft. Landry declined to go back to Colombia in any event
 
 
 [3]
 In Duren appellant challenged the procedures of a state in selecting venires. We assume, however, that the same analysis of disproportion applies when a violation of the sixth amendment by the federal government is alleged. In the present case no issue of a significant federal interest is raised so we need not decide whether that aspect of the analysis would apply in the case of a federal violation
 
 
 [4]
 Appellant argues, for example, that persons under the age of thirty who are eligible for jury service constitute such a group
 
 
 [5]
 By our calculations, the actual disparities in the cases cited by the Court were 27.1%, 24.4%, and 19.7%
 
 
 [6]
 See Berry v. Cooper, 577 F.2d 322, 326 n.11 (5th Cir. 1978); United States v. Goff, 509 F.2d 825, 826-27 & n.3 (5th Cir. 1975), Cert. denied, 423 U.S. 857, 96 S.Ct. 109, 46 L.Ed.2d 83 (1975)
 
 
 [7]
 Broadway v. Culpepper, 439 F.2d 1253 (5th Cir. 1971), Berry v. Cooper, 577 F.2d 322 (5th Cir. 1978)