United States Court of Appeals
Fifth Circuit

**F I L E D**

May 17, 2004

Charles R. Fulbruge III
Clerk

**REVISED MAY 19, 2004**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 03-40475

_____

DAROYCE LAMONT MOSLEY,

Petitioner - Appellant,

versus

DOUG DRETKE, Director, Texas Department
of Criminal Justice, Correctional Institutions Division,

Respondent - Appellee.

_____

Appeal from the United States District Court
For the Eastern District of Texas

_____

Before HIGGINBOTHAM, SMITH, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Petitioner DaRoyce Lamont Mosley ("Mosley") argues that he is entitled to habeas relief because:  (1) prejudice should have been presumed on his ineffective assistance of appellate counsel claim; (2) his right to due process was violated by the trial court's decision to begin the penalty phase of his trial on Saturday instead of Monday; and (3) his right to equal protection was violated by the

1

discriminatory manner in which grand jury forepersons were selected. Because we find no constitutional violations, we AFFIRM.

## I. FACTS AND PROCEEDINGS

Mosley was convicted of capital murder for the death of Patricia Colter on October 28, 1995, and sentenced to death on November 3, 1995.

Patricia Colter, along with her husband Duane Colter, her ex-husband Alvin Waller ("Waller"), and Luva Congleton ("Congleton"), were keeping waitress Sandra Cash ("Cash") company as she closed up Katie's Lounge in Kilgore, Texas on July 21, 1994. Cash was placing the receipts for the evening in a tackle box Katie's used to store money. At approximately 11:45 p.m., two armed men wearing ski masks burst through the door. The first man through the door said, "Give me the money, you white bitch."[1] While sliding the tackle box towards the gunman, Cash was shot in the hand as she attempted to shield her face. She was then shot in the stomach, but nonetheless managed to call 911. This is all that Cash, the sole survivor, was able to recall.

Cash and the bodies of the Colters, Waller, and Congleton were found by police and EMS upon their arrival. Autopsies revealed that the Colters each died from a single gunshot wound to the back of the head. Bullets were recovered. Congleton was also shot in the back of the head, but no bullet was recovered. Waller was shot twice in the head, and once in the thigh; any one of the three wounds would have been fatal. Forensics determined that the gun that shot Cash was not the same gun that shot Waller and the Colters.

---

[1]Cash and the four patrons of Katie's were white; Mosley and the others arrested for the robbery and murders were black.

Mosley, Marcus Smith ("Marcus"), and Ray Don Mosley ("Ray Don"), Mosley's uncle, were arrested separately on July 22 after the police received several tips. One such tip was from Ricky Wheat, who lived across the street from Katie's Lounge. He informed police that Ray Don, along with Marcus and Mosley, had spoken with him on July 21 outside his residence. Ray Don, who was in possession of a pistol, told the informer that there was some money in the area and that he had to have it. This party of three left the Wheat property, and returned 30 minutes later with a tackle box, requesting a ride. Ricky Wheat stated that Ray Don told him he had shot someone over at Katie's Lounge. Another tip was from Christopher "Kaboo" Smith ("Kaboo"), Mosley's best friend and Marcus's cousin. Kaboo told police that on the evening of the murders he saw Mosley with a gun, which Mosley claimed to have gotten from Stanley Rossum, a neighbor. Mosley left, but returned with Marcus and Ray Don. Ray Don stated that they had killed people in Katie's Lounge. After Kaboo expressed his disbelief, Mosley responded, "We did it." Then Mosley divided the contents of the tackle box evenly between Kaboo, Ray Don, and Marcus, each party receiving $77.00.

On July 22, 1994, after pulling over Mosley to arrest Marcus, the police asked Mosley if he would voluntarily go to the police station to answer some questions. Mosley agreed.

At first, Mosley averred that he had nothing to do with the robbery and murders at Katie's Lounge. After the police received information from Marcus, however, they arrested Mosley. At this point, Mosley made a second oral statement and admitted to shooting two of the people at Katie's Lounge. Mosley requested and received the presence of his grandparents before continuing further. In the third statement, which was transcribed, Mosley insisted that the offense had been planned in advance, but that once it was time to go through with the plan, he did not want to participate. Although he admitted to being present at Katie's Lounge when the shootings occurred, he denied

3

shooting anyone.  He also informed the police that he had been wearing a ski mask or toboggan during the offense and had thrown it in the woods near the Wheat residence.

Based upon information in the third statement, law enforcement officers requested Mosley accompany them in search of the discarded hat.  A glove was found near the toboggan, and Mosley then admitted to wearing a glove during the robbery.  Law enforcement agents explained to Mosley that they could tell by the residue on the glove whether the person wearing it had fired a gun.  They asked if Mosley had anything to add to his previous statements.

At this time Mosley made another oral statement, indicating that he had shot four people at Katie's Lounge and Ray Don had shot the woman behind the bar.  After a period of rest, Mosley made his final statement to police.

> Ray Don went in first and told everybody to get down.  They were still sitting up in the chairs and I heard a shot.  The people looked at me and it scared me and I shot a lady at the table.  I was about five feet from her and I shot her in the back of the head.  Another lady got up and ran.  Ray Don told me to kill them.  Ray Don told me to shoot them or get shot.  When I looked at Ray Don, he was pointing the gun at me.  He said this after I had already shot the first lady.  Then I shot a man who was sitting by the first lady I shot.  I don't know where I shot the man at.  I was about the same distance I was when I shot the lady.  By this time the lady that ran had gotten under the pool table.  I told the lady to get out from under the pool table.  Ray Don said, "Fuck that, shoot her."  Then I shot the lady under the pool table twice in the head.  I bent down next to the pool table and shot her twice.  Then Ray Don was behind the bar and had shot behind there.  I came from around the pool table and another man was by the bar.  The man got up and was coming towards me with a pool stick.  Ray Don said, "Shoot him boy, shoot him."  I just turned my head away and shot three times.  The man fell after I had shot three times.  Ray Don had gotten the money in a big box from behind the bar.  The box was dark colored.  Then we ran out and ran across the street.  Ray Don started hollering and asking me where Marcus was at.  I kept telling him I didn't know.  Then we saw Marcus come up behind us after we crossed Highway 136.  Ray Don asked Marcus where he had been and Marcus told him he had been trying to break in a car.  Marcus went into Katie's when Ray Don and I went in.  After I shot the first lady, I looked around and Marcus had left Katie's.

Mosley was indicted for the capital murder of Patricia Colter on August 4, 1994.

4

During his trial, Mosley was represented by Gary Bledsoe ("Bledsoe"), Cynthia Orr ("Orr"), and Gerald Goldstein ("Goldstein"). The jury returned a guilty verdict Saturday, October 28, 1995. The penalty phase of the trial began the same day; the jury returned a death sentence on November 3, 1995.

Bledsoe and Orr represented Mosley on direct appeal to the Texas Court of Criminal Appeals. That court affirmed his conviction and sentence. *Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998). The Supreme Court of the United States denied Mosley's petition for a writ of certiorari on April 19, 1999. *Mosley v. Texas*, 526 U.S. 1070 (1999).

Before the affirmation of his conviction and sentence on direct appeal, Mosley commenced his state post-conviction action on December 14, 1997. Although the trial court recommended that he be granted relief on his ineffective assistance of counsel ("IAC") claim, the Texas Court of Criminal Appeals denied Mosley's application for state habeas relief. Mosley's petition for writ of certiorari as to his state habeas claims was denied by the Supreme Court on January 10, 2000. *Mosley v. Texas*, 528 U.S. 1083 (2000).

Mosley's present writ of habeas corpus was filed on June 30, 2000 in the district court for the Eastern District of Texas. Although the district court denied habeas relief, it granted a certificate of appealability on the three claims now before this Court.

## II. STANDARD OF REVIEW

Because Mosley filed his habeas petition after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254 (2000), this statutory scheme governs our review. *Penry v. Johnson*, 532 U.S. 782, 792 (2001).

5

AEDPA dictates that this Court will not overturn a state court's adjudication of a prisoner's claims unless the state court's decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, " or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (2000). "A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts." *Pondexter v. Dretke*, 346 F.3d 142, 145-46 (5th Cir. 2003). We use the same standard as the district court in reviewing the state habeas court's decision. *Young v. Dretke*, 356 F.3d 616, 624 (5th Cir. 2004). We review legal determinations *de novo*, and the district court's findings of fact for clear error. *Busby v. Dretke*, 359 F.3d 708, 713 (5th Cir. 2004).

### III. DISCUSSION

A.    Ineffective Assistance of Counsel on Appeal

The first issue before us is whether the state court's determination that prejudice could not be presumed from the filing of Mosley's appellate brief is contrary to, or an unreasonable application of, clearly established federal law. Mosley contends that because his brief on direct appeal was filed late, and because the brief itself was "woefully inadequate," prejudice should have been presumed. The Government counters that Mosley failed to show prejudice, much less that prejudice should be presumed.

Relief based upon an IAC claim, under the standard enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984), may only be granted if the petitioner demonstrates both that counsel was

6

deficient and that the deficiency prejudiced the petitioner's defense. 466 U.S. at 687-88, 690. In extremely rare circumstances, however, prejudice may be presumed from the delinquent performance of counsel. This presumption of prejudice may occur if there is a complete denial of counsel, or if "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 659 (1984). Mosley does not contend that counsel was not present or available during direct appeal; we therefore assume that he contends that the prosecution's case was not tested because of the sub-standard briefing on appeal.

Uncontested evidence reveals that the brief submitted on direct appeal[2] was a 205 page tome, raising 173[3] points of error. This brief was filed after several extensions of time, and was nonetheless ultimately filed late. The brief was never proofread in its entirety. On direct appeal, the court addressed roughly 20 of the 173 points of error. Several sets of objections were repeated later in the brief, while others were not addressed because they were inadequately briefed. There was testimony suggesting that the brief was prepared *after* the expiry of the last filing deadline.

Despite these inadequacies, it is clear from the thoughtful opinion from the Court of Criminal Appeals that Mosley's appellate counsel did subject the prosecution's case to meaningful testing. This is unlike the brief in *Passamore v. Estelle*, 607 F.2d 662, 663-64 (5th Cir. 1979), which was a presumptively-prejudicial one page anomaly. In the case at bar counsel provided adequate grounds for appeal for the court to review, and, ultimately, to deny. That the brief contained assignments of

---

[2]Mosley makes much of the briefing deficiencies of counsel at trial; these deficiencies, however, are of no moment to the present petition, because he failed to apply for and receive a COA on this issue.

[3]The Court of Criminal Appeals noted that although there were apparently supposed to be 176 points of error, there were no points of error numbered 75-77, so in reality there were only 173 points of error.

error above (or below) and beyond those addressed by the court does not make the brief presumptively prejudicial. We therefore decline to grant habeas relief on this claim.

B.     Due Process

Mosley next contends that the state court's ruling that the trial court's refusal to allow counsel additional time to prepare for the punishment phase was not a violation of his due process rights is contrary to, or an unreasonable application of, clearly established federal law. Mosley maintains that his due process rights were violated when the trial court forced his attorney to begin the penalty phase on Saturday after the jury returned a verdict in the guilt phase. As was his stance with respect to his IAC claim, Mosley again claims that prejudice can be presumed under *Cronic*.

The jury returned a guilty verdict on Saturday, October 28, 1997. The Government indicated that it had its witnesses on 30 minute call to proceed with the penalty phase. Orr objected, indicating to the court that she understood that even if the guilty verdict were returned on Saturday, the penalty phase would not begin until Monday, October 30, 1997. Because this was her understanding, Orr had failed to prepare any strategy overall, had failed to prepare a strategy for cross-examining witnesses, and had failed to have defense witnesses on call. It was later revealed that Goldstein was scheduled to do the penalty phase, and that Orr had never intended to perform these duties.

Based upon the preferences of the jury, the court refused Orr's request for a continuance until Monday. Instead, Orr was given two hours to prepare for the penalty phase of the trial.

In his brief to this Court, Mosley offers no cases to support a due process claim based upon a trial court's ruling that the penalty phase would commence immediately after the guilt phase of a

8

trial.  Because the due process claim has not been briefed to this Court, we decline to examine it.  *See Yohey v. Collins*, 985 F.2d 222, 224-25 (5th Cir. 1993) (finding that a defendant abandons arguments by failing to argue them in the body of his brief).

Although Mosley claims this portion of his brief amounts to a due process challenge, the cases he cites in support of his contention are for Sixth Amendment deprivation of effective assistance of counsel.  Out of an abundance of caution, we will address his claims  with respect to the sentencing phase of the trial as IAC claims.  In so doing, we cannot find this lack of preparation for one portion of his trial deficient.  As the Supreme Court noted in *Morris v. Slappy*, 461 U.S. 1, 11 (1983) "[n]ot every restriction on counsel's time or opportunity to investigate or consult with his client or *otherwise to prepare for trial* violates a defendant's Sixth Amendment right to counsel. . . . [O]nly an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel." (emphasis added) (citations and quotations omitted).  In *Slappy*, the Supreme Court found no violation of the defendant's right to counsel despite the fact that replacement counsel had been appointed six days prior to the beginning of trial.  The circumstances here are even less problematic, primarily because Orr was chief counsel throughout the guilt phase of the trial.  She was intimately acquainted with Mosley and the facts of the case.  She had heard all of the testimony and had an opportunity to observe the jury.  That Orr had been warned that the penalty phase would begin after the resolution of the guilt phase, and chose to ignore that warning, does not rise to the level of ineffective assistance of counsel.

C.     Equal Protection

The final, and most contentious, issue before us is whether the state court's determination that there was no equal protection violation in the selection of the grand jury foreperson is contrary to,

9

or an unreasonable application of, clearly established federal law. Mosley asserts that the Court of Criminal Appeals's application of the due process, instead of equal protection test, violates Supreme Court precedent. The Government insists that the use of the due process test was not in violation of clearly established Supreme Court precedent, even though the state court's methodology was contrary to Fifth Circuit precedent.

At the heart of the matter are two Supreme Court cases: *Rose v. Mitchell*, 443 U.S. 545 (1979), and *Hobby v. United States*, 468 U.S. 339 (1984). *Rose* addressed a possible equal protection violation in the selection of grand jury forepersons. *Hobby*, on the other hand, addressed a possible due process violation in the selection of grand jury forepersons.

(1)     *Rose v. Mitchell* and the Equal Protection Clause

In *Rose*, four black men indicted for capital murder filed pleas in abatement, seeking dismissal of their indictments "on the grounds that the grand jury array, *and the foreman*, had been selected in a racially discriminatory fashion." 443 U.S. at 548 (emphasis added). In Tennessee, a grand jury consisted of 12 members, with the foreperson making up the thirteenth. The 12 grand jury members were selected by a key man system, in which three commissioners compiled a list of qualified potential jurors from which the grand jurors were selected at random. The foreperson, on the other hand, was appointed by the judge of the court for a two year term. *Id.* at n.2. The pleas in abatement were denied, and the four were found guilty of first-degree murder. *Id.* at 549. On direct appeal, the convictions were affirmed. *Id.* After post-conviction proceedings, the Supreme Court granted certiorari to consider the equal protection claim with respect to the selection of the foreperson of the grand jury. *Id.* at 550.

10

The court first determined that racial discrimination did pose a potential for harm, even in the context of the selection of grand jury forepersons. 443 U.S. at 554. It then reviewed the evils sought to be eradicated by the Equal Protection Clause, observing that "[d]iscrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice. Selection of members of a grand jury because they are of one race and not another destroys the appearance of justice and thereby casts doubt on the integrity of the judicial process." *Id.* at 555-56. It is for this reason that the Supreme Court "recognized that a criminal defendant's right to equal protection of the laws has been denied when he is indicted by a grand jury from which members of a racial group purposefully have been excluded." *Id.* at 556.

The Supreme Court then addressed concerns expressed in the concurrence that the remedy necessary for discrimination in the selection of the grand jury — quashing the indictment — was too drastic. The Court noted that even if the original indictment were quashed, the defendant could still be re-indicted, and re-convicted, with the same proof used at the first trial, so long as the procedure used "conforms to constitutional requirements." 443 U.S. at 552 (citations omitted). While recognizing this as a cost, the Court nonetheless insisted this was the remedy necessary if discrimination were found in the selection of the grand jury or the grand jury foreperson. *Id.* at 551.

Reviewing the facts of the case before it, the Court reminded readers that habeas relief was only available if discrimination were proved. "[I]n order to show that an equal protection violation has occurred in the context of grand jury foreman selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs." 443 U.S. at 565 (citations omitted). A prima facie case of discrimination may

11

be established only if three requirements are met: (1) the group is a recognizable, distinct class, singled out for different treatment; (2) the degree of underrepresentation is calculable by comparing the proportion of the group in the total population to those called to act as grand jury forepersons over "a significant period of time"; (3) the selection procedure is susceptible of abuse. *Id.* If the defendant makes such a prima facie showing, the burden shifts to the state to rebut that showing.

The Supreme Court determined that, although arguendo the first and third requirements had been met, the degree of underrepresentation had not been established. 443 U.S. at 566. The defendants based their case for underrepresentation solely on the testimony of three former grand jury foremen from the county in question. The Court concluded that the testimony did not cover any significant period of time and failed to include any numerical data on the total number of grand jury forepersons appointed during the critical period of time, and thus that the defendants failed to establish a prima facie case of discrimination. *Id.* at 570-71.

(2)     *Hobby v. United States* and the Due Process Clause

The Supreme Court in *Hobby v. United States*, 468 U.S. 339 (1948), faced a similar set of facts but wholly different constitutional claims than it did in *Rose*. Hobby, a white male defendant, alleged that discrimination against blacks and women in the selection of federal grand jury forepersons resulted in a violation of his right to due process under the Fifth Amendment. 468 U.S. at 341-42. Because of this discrimination, Hobby asserted, the indictment against him should have been quashed. *Id.* at 343.

The Supreme Court disagreed. It first observed that, while due process rights were implicated in the discriminatory selection of a grand jury, no such rights were implicated by the discriminatory selection of a grand jury foreperson. "Unlike the grand jury itself, the office of grand jury foreman

12

is not a creature of the Constitution; instead, the post of foreman was originally instituted by statute for the convenience of the court." 468 U.S. at 344. The Court found that Hobby's *due process rights* were not impinged upon by the selection of a grand jury foreperson in a discriminatory fashion. The role of the foreperson in a federal grand jury, the Court observed, is purely ministerial. Given the ministerial purpose of the position, "discrimination in the selection of one person from among the members of a properly constituted grand jury can have little, if indeed any, appreciable effect upon the defendant's *due process right to fundamental fairness*." *Id.* at 345 (emphasis added).

Hobby argued that *Rose* compelled a different result and that the Supreme Court should set aside his indictment. 468 U.S. at 346. The Court disagreed, finding Hobby's reliance on *Rose* misplaced. First the Court noted that the defendants in *Rose* were of the same race as those excluded from the jury.[4] The Court also observed that the state of Tennessee used a unique method to select the jury foreperson in *Rose*. In the federal system, under which Hobby was indicted, the jury foreperson was selected from among the twelve grand jurors, while in *Rose* the twelve grand jurors were selected, and then the judge selected a thirteenth person as the jury foreperson, effectively putting on the grand jury a "surrogate of the judge." *Id.* at 348. Finally, the Court distinguished *Rose* because of the role the foreperson was to play on the Tennessee grand jury as opposed to the federal grand jury. In Tennessee, the foreperson had investigative and administrative power, while in the federal system, the role was ministerial in nature. *Id.* at 348-49. The *Hobby* Court concluded that *Rose* "assumed . . . that discrimination with regard to the foreman's selection would require the

---

[4]After the Supreme Court's decision in *Campbell v. Louisiana*, 523 U.S. 392 (1998), which extended standing to white criminal defendants raising equal protection and due process objections to discrimination against black persons in grand jury selection, this point of distinction is no longer relevant.

13

setting aside of a subsequent conviction," but that "[n]o such assumption is appropriate here, however, in the very different context of a *due process* challenge by a white male to the selection of foremen of federal grand juries." *Id.* at 349 (emphasis added).

(3)      Mosley's Equal Protection Claim under *Hobby*

When Mosley brought his equal protection claim, the Texas Court of Criminal Appeals on direct appeal concluded that *Hobby*, and not *Rose*, controlled. It determined that, although *Rose* was directed at an equal protection claim, as was Mosley's claim, the ministerial nature of the Texas state grand jury foreperson, along with the method of foreperson selection, made the case more closely resemble the facts outlined in *Hobby*. *Mosley v. State*, 983 S.W.2d 249, 256 (Tex. Crim. App. 1998). In dismissing Mosley's appeal on this issue, the court intoned that Mosley's

> own equal protection interests are satisfied by the impartial selection of the members of the grand jury. That selection ensures that the decision-making process is not tainted by racial discrimination. Because the foreman's additional duties are merely ministerial, they do not impact an appellant's right to a grand jury determination of probable cause to go forward with a prosecution.

*Id.* Despite federal cases to the contrary, the Texas Court of Criminal Appeals followed its precedent in *Rousseau v. State*, 855 S.W.2d 666, 687-688 (Tex. Crim. App. 1993), and upheld the constitutionality of Mosley's indictment under *Hobby*.

The decision of the Texas Court of Criminal Appeals to apply *Hobby* to the case at bar flatly contradicts the clearly established federal law of *Rose*. The distinction between *Hobby* and *Rose* lies not with the role of the foreperson, but rather with the nature of the alleged injury. *Johnson v. Puckett*, 929 F.2d 1067, 1071 (5th Cir. 1991). The Texas court mistakenly assumed that only Mosley's equal protection interests were implicated by the selection of a grand jury foreperson. This

14

is simply not the case. When Mosley makes an equal protection challenge, he also represents the interests of those who are not selected as grand jury forepersons. While these "non-selects" may have no due process interests in being a grand jury foreperson, they undoubtedly have an equal protection interest in performing the duties of foreperson. *Id.* "This [equal protection] injury to society as a whole, as well as the stigmatization and prejudice directed against a distinct group, exists regardless of the extent of the grand jury foreman's authority." *Id.*

The Supreme Court in *Rose* unequivocally stated that "in order to show that an *equal protection violation* has occurred in the context of grand jury foreman selection, the defendant must show that the procedure employed resulted in substantial underrerpresentation of his race or of the identifiable group to which he belongs." 443 U.S. 545, 565 (emphasis added). Nothing in *Hobby* purported to address an alleged equal protection violation or to change the test for equal protection violations as elucidated in *Rose*. *Rose* provides the three-step test for evaluating an equal protection claim; the Texas state court simply failed to apply this standard. The decision reached by the Texas state court is in direct conflict with *Rose*, and therefore Mosley is entitled to habeas relief, in the form of having the correct test applied.

(4)     Mosley's Equal Protection Claim under *Rose*

Applying *Rose* to the facts at hand, Mosley has failed to make a prima facie showing of discrimination. There is no question that Mosley, as a black man, is a member of a recognizable group.

Mosley also satisfies the third prong of the *Rose* test, which inquires as to whether the process for selecting grand jury forepersons is susceptible to abuse. Potential members of grand juries in Gregg County are selected either using the grand jury commissioner system or a jury wheel system.

15

Under Texas law, "[w]hen the grand jury is completed, the court shall appoint one of the number foreman." TEX. CODE CRIM. PROC. ANN. art. 19.34 (1977). This unfettered discretion permits the trial court to select the foreperson by simply looking at the grand jury members. "In cases in which the jury commissioners have had access to the racial identity of potential grand jurors while engaged in the selection process, the Supreme Court has repeatedly found that the procedure constituted a system impermissibly susceptible to abuse and racial discrimination." *Rideau*, 237 F.3d at 488. A judge in Texas has access to the race of potential grand jury forepersons as the entire grand jury array is visible to him. "Obviously that practice makes it easier for those to discriminate who are of a mind to discriminate." *Alexander v. Louisiana*, 405 U.S. 625, 631 (1972) (citations omitted).

Not only is this method of selecting a foreman opaque, but the Government effectively established by its own testimony the susceptibility of the process to abuse. The prosecuting attorney for Mosley's case, Richard Dunn ("Dunn") testified at the hearing to quash the indictment that, in his years in the District Attorney's office, from 1982 to the date of the hearing, he had noticed a pattern in the selection of grand jury forepersons. He testified:

> [In] '87 . . . it began to be noticeable to me, perhaps even a few years later on, that there were not any African-Americans from our community who had actually presided and been Foreman of the Grand Jury. Since it was the law, and we submit it still is, that when the job is ministerial in nature only, the race of the Foreman doesn't make that much difference  so long as the overall process is not under-representative which we did not believe it to be. However, there came a time –- and that time — and I wish I could give everybody a date on this with more precision — but I can tell everyone here that that happened on — what I'm about to describe happened some time in mid to late 1991. I talked to Mr. Brabham [the district attorney] and related my concerns to him that, even from the standpoint of appearance and from no other standpoint, and fundamentally dealing with respect to the process, setting aside what some Appellate Court might or might not say, that I was beginning to be concerned that we did not have any African-American Grand Jury Foreman — or that we had not. I recalled one — I happened to recall one from 1983 who had been Foreman. But from 1984, '85, '86 — particularly beginning with '85, I was aware that there had not been a Grand Jury Foreman who was African-American. Based on that — as I

16

said approximately that time — we'll say the middle of 1991, I approached each of our District Judges, Judge Khoury [presiding over the Mosley trial] and Judge Starr, and mentioned to them that I saw this as something they just needed to be aware of.

There was further testimony that, from January 1991, the time at which Dunn alerted the judges of Gregg County of the trend he had noticed, until the time of Mosley's trial, 20.8% of all grand jury forepersons were black.

The most pressing concern is whether Mosley presented a degree of underrepresentation of blacks as grand jury forepersons over a significant period of time, and thereby satisfied the second prong of *Rose*. Reviewing the voluminous record on the matter, we conclude that he has not adequately established underrepresentation. At a hearing on Mosley's motion to quash his indictment, the trial court was presented with the following uncontroverted testimony: according to the 1990 census, 17.3% of the adult voting age population of Gregg County was black; from the beginning of 1984 through the end of 1994, sixty-three grand jury forepersons were selected, only five of whom, or 7.9%, were black. The absolute difference between the percentage of voting age blacks in Gregg County and the percentage of blacks chosen as grand jury forepersons is 9.4%.[5]

It is true that the Supreme Court "has never announced mathematical standards for the demonstration of systematic exclusion of blacks." *Rideau v. Whitley*, 237 F.3d 472, 487 (5th Cir. 2000) (citations and internal quotations omitted). This Court has, however, recognized that absolute disparities of 19.7%, 14.7% and 13.5% are sufficient to satisfy this prong of the *Rose* test. *Id.* at 486 (citing *Sims v. Georgia*, 389 U.S. 404 (1967) and *Jones v. Georgia*, 389 U.S. 24 (1967)). This Court

---

[5]When the group in question makes up a sufficiently large proportion of the overall population, absolute disparity is the only disparity used by this Court to determine underrepresentation. We leave open the possibility that if the distinctive group at issue makes up less than 10% of the population, comparative disparity may be used. *United States v. Butler*, 615 F.2d 685, 686 (5th Cir. 1980), *denial of petition for rehearing en banc*.

has also recognized that absolute disparities of 10% or less are insufficient to establish statistical discrepancies worthy of relief. *See United States v. Maskeny*, 609 F.2d 183, 190 (5th Cir. 1980) (finding that the disparity offered by the defendant was less than 10% and therefore did "not make out a constitutional violation").[6] We find the reasoning employed in *Maskeny* persuasive, and again do not believe that the Supreme Court intended the amount of disparity necessary to prove purposeful discrimination in the jury venire in violation of the Equal Protection Clause to be different from the amount of disparity necessary to make a prima facie case under *Rose*. In the present case, we find an absolute disparity of 9.4% is insufficient to make out a prima facie equal protection violation under *Rose*.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[6]In *Maskeny*, this Court recognized that while the 10% figure it was using came from an equal protection case where purposeful discrimination needed to be shown, *Swain v. Alabama*, 380 U.S. 202 (1965) *overruled in part by Batson v. Kentucky*, 476 U.S. 79 (1986), nothing in Supreme Court jurisprudence suggested that the necessary amount of disparity would differ between an equal protection claim and a Sixth Amendment cross-section. 609 F.2d 183, 190 (1980).

18